909 F.2d 1524
 1990-2 Trade Cases 69,124
 J.F. FEESER, INC., and Juniata Foods, Inc., Appellants,
v.
SERV-A-PORTION, INC.; Hunt-Wesson Foods, Inc.; and Weis
Markets, Inc.; Mark Crane, Mediator, Sky Brothers, Movants.
 No. 89-5729.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 1, 1990.
Decided Aug. 2, 1990.
 
 Jeffrey L. Kessler (argued), Weil, Gotshal & Manges, New York City, William J. Flannery, Morgan, Lewis & Bockius, Harrisburg, Pa., for appellants.
 Jeffrey Apfelbaum, Apfelbaum, Apfelbaum & Apfelbaum, Sunbury, Pa., Richard M. Jordan (argued), White & Williams, Philadelphia, Pa., for appellee Weis Markets, Inc.
 Carleton O. Strouss, Kirkpatrick & Lockhart, Harrisburg, Pa., J. Edd Stepp, Jr. (argued), Peter Sullivan, David P. Restaino, Gibson, Dunn & Crutcher, Los Angeles, Cal., Norman P. Adler, San Francisco, Cal., for appellee Serv-A-Portion, DiGiorgio Corp.
 Before STAPLETON and MANSMANN, Circuit Judges, and ACKERMAN, District Judge.*
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 In this antitrust matter involving the highly competitive food distribution business, we are asked to review a grant of summary judgment in favor of the defendants, a supplier and a wholesaler, and against the plaintiff wholesalers. The litigation primarily involves allegations of secondary line price discrimination in violation of sections 2(a) and 4 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Secs. 13(a), 15 (1936). Secondary line injury cases are characterized by price discrimination by a seller in sales to competing buyers.
 
 
 2
 Also at issue are whether the plaintiffs presented sufficient and relevant material facts to defeat the entry of summary judgment on a Sherman Act claim, i.e., did a conspiracy exist between the supplier and a competing wholesaler to discriminate in price to the detriment of the plaintiff-wholesalers, and whether one of the plaintiffs had the standing to bring this lawsuit. The plaintiffs allege that the district court usurped the function of the jury by improperly resolving disputed questions of fact and by evaluating the credibility of the testimony.
 
 
 3
 On review de novo, we conclude first, with respect to the Robinson-Patman Act claim, that the plaintiff has presented sufficient evidence supporting its position that, over a four year period of time, the defendant supplier discriminated against it in the prices charged for portion-controlled products. Genuine issues of material fact exist concerning whether the discrimination caused competitive injury (i.e., a reasonable possibility of harm to competition) which resulted in actual damage to the plaintiff. We will, therefore, vacate the district court's grant of summary judgment on this claim and remand for trial.
 
 
 4
 As to the Sherman Act claim, the present record does not reflect sufficient evidence of either the conspiracy or arrangement to exclude the plaintiff from the food distribution market to sustain a Sherman Act violation. We are aware, however, that the district court limited discovery to the issues of competitive impact and injury in the context of the Robinson-Patman claim. Since the plaintiffs alleged, in an affidavit filed pursuant to Fed.R.Civ.P. 56(f), that further discovery will uncover evidence of the conspiracy, we will vacate the dismissal of this count and remand for further discovery.
 
 
 5
 Finally, we find that the district court erred in deciding that Plaintiff Juniata Foods, Inc., does not have standing to proceed in the action. In conflict with other evidence, an affidavit indicates that Juniata was a wholesaler who directly purchased from Serv-A-Portion. Once again questions of material fact remain for the factfinder. Juniata, at this stage, will remain in the lawsuit.
 
 I.
 
 6
 The plaintiffs, J.F. Feeser, Inc., now known as Feesers, Inc., and Juniata Foods, Inc., commonly-owned corporations, are wholesale distributors of food products and related items to institutional purchasers (e.g., schools, nursing homes, hospitals, caterers and restaurants). Defendant Weis Markets, Inc., is engaged in the business of distributing food and related products to the same type of institutional customers to whom Feeser and Juniata distribute and is, therefore, in direct competition with them. Defendant Serv-A-Portion, Inc., is a manufacturer and packager of food products which it sells to distributors. Serv-A-Portion is a leading supplier of portion-controlled food products, such as individual servings of ketchup, jelly, syrup and dressings. Serv-A-Portion has sold, and its successor, DiGiorgio Foods,[1] has continued to sell, a variety of portion-controlled products to Feeser, Weis Markets and other competitors, including Tartan Foods and Sky Brothers, in interstate commerce. The claims against Hunt-Wesson Foods, Inc., also a manufacturer and packager of the portion-controlled products, have been settled.
 
 
 7
 It is undisputed that food distribution is a highly competitive business. Since portion-controlled products are primarily "give away" items,[2] the end user (i.e., the final institutional purchaser) is sensitive to minute price differences between the competing wholesalers. In addition, these particular products are considered "bellwether" items which are customarily utilized as a gauge by the distributor's customers to evaluate a company's overall pricing. Accordingly, it is contended by Feeser and Juniata that its inability to offer competitive prices on Serv-A-Portion products not only impacted on its overall business goodwill but also caused the loss of other business.
 
 
 8
 The impact of these price differences prompted Feeser and Juniata[3] in 1985 to file a complaint contending that Serv-A-Portion discriminated against them in the prices it charged for its portion-controlled products and in favor of its competitors, Weis Markets, Tartan Foods and Sky Brothers. The alleged discrimination primarily involved the manner in which Serv-A-Portion conducted its pricing policies. According to Feeser, Serv-A-Portion had two general categories of pricing: truckload and bidding. It is Serv-A-Portion's bid pricing which Feeser contends operated in a discriminatory fashion. Products purchased through Serv-A-Portion's bidding process, available at lower prices, were offered to Serv-A-Portion's customers (the wholesalers) only on a case-by-case basis after submission of a formal and specific bid and on condition that they could be resold only to certain end users. It is not contested by Serv-A-Portion that its bidding requirements were not rigidly followed nor that Weis Markets used Serv-A-Portion's failure to enforce its procedures to Weis Markets' advantage by selling products purchased by bid to any of its customers.
 
 
 9
 It is also contended by Feeser that Serv-A-Portion utilized other pricing mechanisms to camouflage price discrimination, such as affording special allowances and permitting deductions. Feeser claims that although Tartan Foods and Sky Brothers derived benefits from Serv-A-Portion's deviation from established business practices, it was not granted similar advantages. As a direct result, Feeser alleges that it lost sales when its customers took advantage of the more favorable prices of Serv-A-Portion products offered by Feeser's competitors, Weis Markets, Tartan Foods and Sky Brothers. Feeser claims also that its revenues declined when it was forced to reduce its margins to attempt to meet the prices offered by the favored competitors. In addition to losing sales and incurring reduced profits, Feeser's inability to match Weis Markets' prices resulted in a loss of goodwill among its customers, so that Feeser was not asked to service them on other products.
 
 
 10
 Feeser requested injunctive relief and treble damages for violations of sections 2(a) and 2(f) of the Robinson-Patman Act and section 1 of the Sherman Act. Feeser also averred that the activity engaged in by the defendants represented unfair competition which violates the common law of Pennsylvania.
 
 
 11
 In September of 1985, four months after the complaint was filed, Serv-A-Portion asked the district court to require Feeser to identify and document as a threshold matter all the details of Serv-A-Portion's price discrimination and to cut off all discovery requested by Feeser relating to Serv-A-Portion's sales to competitors other than Weis Markets. On April 29, 1986, the district court entered a discovery order permitting Feeser to review only certain records maintained by Hunt and Serv-A-Portion for a one-year period to be selected by Feeser; requiring that Feeser's expert provide all parties with a price comparison report, supported by documentation, of transactions between Hunt, Serv-A-Portion and Weis Markets; and mandating that Feeser's expert provide all parties with a pricing report comparing transactions between Hunt and Serv-A-Portion and their customers.
 
 
 12
 Discovery continued in this prescribed manner. Feeser's expert economist, Dr. Robert Larner, prepared a pricing analysis that, inter alia, compared Serv-A-Portion's sales of identical products: (a) to Feeser and Weis Markets for the period January 1982 through January 1986; and (b) to Feeser, Tartan Foods and Sky Brothers for the period January 1984 through December 1984--the year for which discovery of Serv-A-Portion's sales to those competitors was permitted.
 
 
 13
 Upon presentation of this evidence by Feeser, Serv-A-Portion contended that the report prepared by Dr. Larner did not show competitive injury and requested that discovery be focused upon the elements of competitive and actual injury. The district court then limited the next phase of discovery to competition and injury and enumerated the manner and extent of such discovery.
 
 
 14
 On June 9, 1988, Serv-A-Portion filed a motion for summary judgment directed toward the issues of competitive impact and injury. For purposes of its motion, Serv-A-Portion acknowledged a slight difference between the prices charged by Serv-A-Portion to Weis Markets and Feeser. Nonetheless, referencing primarily the overall competitive health of the institutional food industry, Serv-A-Portion contended that Feeser had not suffered any injury from any of Serv-A-Portion's pricing practices.
 
 
 15
 At the outset, the district court rejected Serv-A-Portion's position, which relied upon Boise Cascade Corp. v. FTC, 837 F.2d 1127 (D.C.Cir.1988), that, because of the overall competitive health of Feeser and of institutional food distributors generally, there can be no competitive injury for Robinson-Patman purposes. The court disregarded this view finding Boise Cascade to be contrary to Supreme Court authority, see Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (a competitor's sales growth does not rule out a Robinson-Patman claim), and distinguishing it factually on several important grounds.
 
 
 16
 The district court then sought to determine whether Feeser could prove a Robinson-Patman violation under the doctrine of Falls City Industries Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), by showing lost sales or profits caused by the price differential. According to the district court, establishing lost sales caused by Serv-A-Portion's pricing policies was essential in order to demonstrate actual injury entitling Feeser to treble damages under section 4 of the Clayton Act.[4]
 
 
 17
 In reviewing the record submitted in response to the summary judgment motion, the district court systematically excluded much of Feeser's evidence presented through depositions and affidavits. First, the district court denied consideration of depositions of a number of Feeser's salesmen, finding them to constitute hearsay. Other salesmen's depositions, the court decided, were "simply too vague, conclusory or incomplete for a reasonable jury to place reliance upon them." J.F. Feeser, Inc. v. Serv-A-Portion, Inc., No. 85-0684, slip op. at 10 (E.D.Pa. Aug. 4, 1989). The court found some of the depositions probative of lost sales as indicative of better prices offered to favored competitors, yet dismissed the relative worth of these depositions on the assumption that some price differentials would normally occur given the particular nature of the food distribution industry. The district court concluded that there must be more than de minimis violations, as it characterized Feeser's evidence, of the Robinson-Patman Act in both volume and price before competitive injury could be found.
 
 
 18
 The district court then examined employee affidavits submitted by Feeser. The court rejected the affidavits of Feeser salesmen Fuller and Andrews and Juniata's Miller, believing that the hearsay statements of certain customers who refused to buy from them contravened the provision of Fed.R.Civ.P. 56(e), that affidavits must be based on personal knowledge and on facts which would be admissible at trial.
 
 
 19
 Feeser had also submitted affidavits from some of the customers themselves. In general, these affidavits indicated that these customers did not buy from Feeser, but rather purchased from Weis Markets, Tartan Foods and Sky Brothers who offered better prices. The district court did find these affidavits admissible, but once again pointed to the de minimis nature of the evidence and declared that the affidavits were not probative of injury suffered from price discrimination.
 
 
 20
 The district court then turned to the evidence presented concerning other wholesalers who purchased from Serv-A-Portion.[5] The court accepted the testimony of Joanne Straw, who testified that her company, W.R. Straw, Inc., lost sales of Serv-A-Portion products to Pennsylvania State University because the prices Weis Markets offered to Penn State were lower than Straw's actual cost from Serv-A-Portion. The district court did not accept a similar affidavit from Joseph Spagnola, a buyer for R & R Provision Company, which was based upon information from Spagnola's sales personnel, finding that it constituted inadmissible hearsay. The court then characterized this evidence from competitors as "completely non-probative." Id. at 20.
 
 
 21
 The district court next reviewed the expert report prepared for Feeser by Dr. Robert Larner in light of the Robinson-Patman test enunciated by the Supreme Court in FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Under the Morton Salt test, a plaintiff can show injury to competition by providing either proof of a substantial price discrimination between competing purchasers over time or by providing direct proof of lost sales or profits.[6]
 
 
 22
 Although rejecting Serv-A-Portion's major objection to the expert report--that Dr. Larner did not address what Serv-A-Portion considered the relevant economic consideration--the overall growth of competition in the food distribution industry in general and of Feeser in particular--the district court was critical of Dr. Larner's analysis for several other reasons. First, the district court questioned Dr. Larner's use of four-year periods in his report (1978 through 1982 and 1982 through 1986). The court agreed with Serv-A-Portion that the only apparent reason for this grouping was that it achieved the results desired by Dr. Larner. The district court did not credit Dr. Larner's justification that yearly figures fluctuate for various reasons and, by using four-year periods he could establish a greater track record and eliminate unusual events or their effects in one particular year. The district court found objectionable Dr. Larner's failure to elucidate these reasons or unusual events and concluded that "a reasonable jury would not accept his conclusory reasoning as a valid basis for using four-year periods...." Id. at 24.
 
 
 23
 The district court then evaluated with skepticism Dr. Larner's analysis of the increasing and decreasing percentages of Feeser's purchases from Serv-A-Portion and concluded that such comparisons between Feeser's total sales and its Serv-A-Portion purchases revealed nothing about competitive injury or discriminatory pricing. With respect to the figures of the lower prices which Feeser alleged were given to favored competitors, the district court examined the numbers and determined that if Serv-A-Portion had intended to win the favor of Weis Markets, "it did not do a very good job of it." Id. at 29.
 
 
 24
 Finally, the district court rejected Dr. Larner's calculations for the six-month period showing differences in Weis Markets' and Feeser's profit margins on the grounds that the report utilized an insufficient number of products over an insufficient period of time.
 
 
 25
 Turning to Feeser's Sherman Act claim, the district court determined that it must sustain the same fate as the Robinson-Patman allegation because Feeser had not proven any injury to itself or to competition. The district court opined that even assuming a conspiracy between Serv-A-Portion and Weis Markets to grant Weis favorable pricing, this activity, without proof of an arrangement to exclude others from the buyer's market, was not actionable under the Sherman Act. In effect, the district court found that since the sale of Serv-A-Portion products at discriminatory prices is not a Sherman Act violation, a conspiracy to do so is not actionable. The district court also pointed to the lack of evidence indicating any conspiracy or agreement between Weis and Serv-A-Portion to discriminate in price. After deciding that Juniata had no standing to participate in the lawsuit because of evidence that Juniata was not a direct purchaser from Serv-A-Portion, the district court granted Serv-A-Portion's motion for summary judgment.
 
 
 26
 The district court then turned to Feeser's claims against its competitor, Weis Markets, Inc. Although Weis Markets had not moved for summary judgment,[7] the court dismissed all of Feeser's claims against Weis on the ground that such claims depended upon the validity of Feeser's claims against Serv-A-Portion. The pendent state claims were dismissed without prejudice to refiling in the appropriate state court.
 
 
 27
 Feeser has appealed this final judgment and our jurisdiction is thus premised on 28 U.S.C. Sec. 1291.
 
 II.
 
 28
 On appeal from the grant of summary judgment we review the evidence de novo and apply the same standards applicable in the district court.
 
 
 29
 The now familiar and oft-cited trilogy of Supreme Court cases, Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and Matsushita Electric Industrial, Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) refocused the burden of both the movant and the non-movant in summary judgment actions. As a general rule, if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, then summary judgment is appropriate. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, 477 U.S. at 247, 106 S.Ct. at 2509. Although the moving party has the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact, the respondent (the "non-movant") must establish the existence of each element on which it bears the burden of proof. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552. The non-movant is entitled to all reasonable inferences in its favor. We are keenly aware that credibility determinations are not the function of the judge; instead the non-movant's evidence must be credited at this stage. Anderson, 477 U.S. at 249, 255, 106 S.Ct. at 2513.
 
 
 30
 When summary judgment is requested in the context of antitrust litigation, adherence to this standard is appropriate. Miller v. Indiana Hospital, 843 F.2d 139 (3d Cir.1988), citing, Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 31
 We thus turn to the substantive legal standard applicable to each count of Feeser's complaint and review the specific evidence offered by the parties in the context of the summary judgment burdens set forth by the Supreme Court.
 
 III.
 
 32
 Section 2(a) of the Robinson-Patman Act, a 1936 amendment to the Clayton Act, provides, in pertinent part, as follows:
 
 
 33
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them....
 
 
 34
 15 U.S.C. Sec. 13(a).
 
 
 35
 In order to establish a prima facie violation of section 2(a) of the Act, a plaintiff must demonstrate a reasonable possibility that a price difference may harm competition. Falls City Industries, 460 U.S. at 435, 103 S.Ct. at 1288 (1983), citing Corn Products Refining Co. v. FTC, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). "In keeping with the Act's prophylactic purpose, [designed to prevent the occurrence of price discrimination rather than to provide a remedy for its effects], section 2(a) does not require that the discrimination must in fact have harmed competition." Falls City Industries, 460 at 435, 103 S.Ct. at 1288, quoting J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). Instead, a reasonable possibility of harm, often referred to as competitive injury, must be shown. Demonstrating competitive injury as part of a prima facie case suffices to support injunctive relief and implicates further examination of a plaintiff's entitlement to treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15. To recover treble damages a plaintiff must prove more than a violation of section 2(a); it must show the extent of actual injury attributable to the harm to competition. Texaco v. Hasbrouck, --- U.S. ----, ----, 110 S.Ct. 2535, 2543-44, 110 L.Ed.2d 492 (June 14, 1990), citing J. Truett Payne, 451 U.S. at 562, 101 S.Ct. at 1927.
 
 
 36
 Thus, to survive Serv-A-Portion's motion for summary judgment regarding Feeser's request for injunctive relief, Feeser must establish, by competent evidence, that there is a genuine issue of material fact as to whether Serv-A-Portion engaged in pricing policies that caused competitive injury in the market in which the parties participate. Then, to establish entitlement to section 4 treble damages, Feeser must demonstrate a causal connection between the competitive injury and specific damage suffered by it.
 
 
 37
 Since Feeser admits that the alleged discrimination terminated in 1987, the claim for injunctive relief is moot. What must be proven then is that Serv-A-Portion violated the Robinson-Patman Act and that Feeser was, as a consequence, injured in its business. After proof of these elements, Feeser must show the amount of damage it was caused to suffer because of the unlawful conduct. Since the limited scope of the discovery permitted by the district court did not extend to the extent of the damages suffered, we examine whether the present record justifies an expansion of inquiry into this area; see Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (uncertainty with respect to quantum of damages does not preclude section 4 recovery).
 
 
 38
 We begin with the threshold question of whether section 2(a) has been violated. In Texaco v. Hasbrouck, --- U.S. at ----, 110 S.Ct. at 2543-44, the Supreme Court reaffirmed the principle enunciated in FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), that price discrimination within the meaning of section 2(a) is merely a price difference. Here, Serv-A-Portion has conceded, for summary judgment purposes, that a slight difference in price did exist between its products which were sold to Feeser and its products which were sold to Weis.[8]
 
 
 39
 The existence of this price differential does not, however, end the inquiry. In Anheuser-Busch, the Court was careful to emphasize that since price differences constitute only one element of a section 2(a) violation, all price discriminations are not illegal per se. 363 U.S. at 553, 80 S.Ct. at 1276. Rather, in order for a price difference to be illegal under the statute, the difference must have the proscribed anti-competitive effect. Accordingly, we now turn our attention to the element of competitive injury.
 
 A.
 
 40
 At the outset, we are compelled to address a question which, although not emphasized by the defendants or the district court, is of significance here. This issue focuses on whether the protective concern of the Robinson-Patman Act is one directed towards competition in general or whether its goal reaches to protection of specific competitors. Once the scope of the competitive injury is resolved, we then reach the second step--the degree of certainty to which a plaintiff must prove that the requisite injury has occurred in order to establish entitlement to treble damages.
 
 
 41
 Section 2(a) specifies three possible consequences of price discrimination which will satisfy its "effects" proviso, i.e., that the discrimination in price had an adverse "effect" on competition. Although in section 2(a) the first two of these effects refer specifically to discriminatory practices which lessen competition or tend towards monopoly, i.e., broad competitive impacts, the third makes price discrimination illegal where it adversely affects the ability of individual companies to compete. Thus, section 2(a) makes it unlawful to discriminate in price where "the effect may be ... to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...." 15 U.S.C. Sec. 13(a). The language of the statute reflects concern both for the preservation of competition and for the protection of individual competitors. Earl W. Kintner and Joseph P. Bauer, Federal Antitrust Law, Sec. 22.2 (1983).
 
 
 42
 The legislative history as well indicates that one of the factors leading to the 1936 amendment of the Clayton Act was the perception that the 1914 version, containing only the first two conditions, was concerned exclusively with injury to competition. U.S. Representative Hubert Utterback, the congressman in charge of the Conference Report, explained the meaning of the amendments as follows:
 
 
 43
 Effects nos. 1 and 2 above correspond to those required to be shown under the old section 2 of the Clayton Act. Generally speaking, they require a showing of effect upon competitive conditions generally in the line of commerce and market territory concerned, as distinguished from the effect of the discrimination upon immediate competition with the grantor or grantee. The difference may be illustrated where a nonresident concern opens a new branch beside a local concern, and with the use of discriminatory prices destroys and replaces the local concern as the competitor in the local field. Competition in the local field generally has not been lessened, since one competitor has been replaced by another; but competition with the grantor of the discrimination has been destroyed. The present bill is, therefore, less rigorous in its provisions as to the effect required to be shown in order to bring a given discrimination within its prohibitions.
 
 
 44
 80 Cong.Rec. H9417 (1936) (statement by Rep. Utterback) (emphasis added).
 
 
 45
 The Report of the Senate Judiciary Committee explained this portion of the proposed amendments as follows:
 
 
 46
 This clause represents a recommended addition to the bill as referred to your committee. It tends to exclude from the bill otherwise harmless violations of its letter, but accomplishes a substantial broadening of a similar clause now contained in section 2 of the Clayton Act. The latter has in practice been too restrictive, in requiring a showing of general injury to competitive conditions in the line of commerce concerned; whereas the more immediately important concern is the injury to the competitor victimized by the discrimination. Only through such injuries, in fact, can the larger general injury result, and to catch the weed in the seed will keep it from coming to flower.
 
 
 47
 FTC v. Morton Salt Co., 334 U.S. at 49-50 n. 18, 68 S.Ct. at 829-30 n. 18 quoting, S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936).
 
 
 48
 This statutory language and legislative history are highly persuasive indicia of Congress' intent to outlaw price discrimination that tends to injure competitors, rather than competition in general, which we must follow unless the Supreme Court has construed the statute in a contrary manner.
 
 
 49
 The Supreme Court has read Sec. 2(a) in accordance with its language and legislative history. For example, the Court examined this precise issue in FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). After its review of the legislative history of the Robinson-Patman Act, the Court stated that the new provision (of the Act) was intended to justify a finding of injury to competition by a showing of injury to a competitor victimized by the discrimination. Id. at 47, 68 S.Ct. at 828. In so doing, the Court held that harm to competition "may be inferred from evidence that some purchasers had to pay their supplier 'substantially more for their goods than their competitors had to pay.' " Texaco v. Hasbrouck, --- U.S. at ----, 110 S.Ct. at 2543-44, quoting Morton Salt, 334 U.S. at 46-47, 68 S.Ct. at 828. In Morton Salt, the Supreme Court also explicitly stated that a showing that price discrimination was sufficient in amount to influence resale prices was "in itself ... adequate" to show competitive injury. 334 U.S. at 47, 68 S.Ct. at 828. This was because "[i]t would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and sellers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers." Id. at 50-51, 68 S.Ct. at 830-31.
 
 
 50
 In J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), the Supreme Court held that a violation of section 2(a) of the Robinson-Patman Act is proven upon a showing that the effect of such discrimination "may be substantially to lessen competition." Id. at 561, 101 S.Ct. at 1926. The Court subsequently held in Falls City Industries, 460 U.S. at 434-35, 103 S.Ct. at 1288-89 that if a discriminatee shows "proof of substantial discrimination over time" or direct evidence of lost sales caused by the discrimination, then "a reasonable possibility that a price difference may harm competition exists."[9]
 
 
 51
 Subsequent decisions of the courts of appeals have advocated a wide breadth of protection afforded by the Act. In Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578 (2d Cir.1987), the Court of Appeals for the Second Circuit held that "[i]n order to establish the requisite competitive injury in a secondary line case the plaintiffs must prove that, as a disfavored purchaser, it was engaged in actual competition with the favored purchaser[s] as of the time of the price differential." Id. at 584. Its rationale was based upon the Supreme Court's language in FTC v. Anheuser-Busch, 363 U.S. 536, 546, 80 S.Ct. 1267, 1272, 4 L.Ed.2d 1385 (1960), that "the existence of competition among buyers who are charged different prices by a seller is obviously important in terms of adverse effect upon secondary line competition." Best Brands, 842 F.2d at 584, citing 5 J.O. Von Kalinowski, Antitrust Laws in Trade Regulation, Sec. 30.02 (1987) (and cases cited therein). The Court of Appeals for the Second Circuit concluded that "the competitive nexus requirement is satisfied where there is a showing of competitive contact between the recipients of the price differential." Id. at 585.
 
 
 52
 An expanded approach to the reach of section 2(a) liability has also been adopted in a case from the Court of Appeals for the Ninth Circuit, recently affirmed by the Supreme Court. In Hasbrouck v. Texaco, Inc., 842 F.2d 1034 (9th Cir.1987), aff'd --- U.S. ----, 110 S.Ct. 2535, 110 L.Ed.2d 492 (June 14, 1990), a case involving primarily the status of functional discounts in the context of the Robinson-Patman Act, the court of appeals found that the distinction between protecting competition and protecting competitors had been "misconstrued with some regularity." The court opined that the purpose of drawing a distinction between harm to competition and harm to competitors is to demonstrate that although not all acts that harm competitors harm competition, the converse is not true. The court reasoned:
 
 
 53
 Injury to competition necessarily entails injury to at least some competitors. Competition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition, although the weight to be attached to such evidence depends on its nature and on the nature of the challenged conduct.
 
 
 54
 Id. at 1040. After a discussion of the type and the extent of harm required to demonstrate a Robinson-Patman violation, the court concluded that "in order for a plaintiff to prove competitive injury under Robinson-Patman, he need only show that a substantial price discrimination existed as between himself and his competitors over a period of time." Id. at 1041.[10]
 
 
 55
 The Court of Appeals for the First Circuit examined this issue in Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525 (1st Cir.1989), a case brought under the Sherman Act. Although there was no allegation of a Robinson-Patman violation because of the absence of interstate dealings, the court nonetheless discussed the Act and distinguished it from the Sherman Act by stating that the Robinson-Patman Act extends its protection to competitors while the Sherman Act protects competition. It construed the Robinson-Patman Act to protect "those who compete with a favored seller, not just the overall competitive practice." Id. at 529. Thus, in the opinion of our sister court, the Robinson-Patman Act will forbid selective but non-predatory price competition in some circumstances. Id.
 
 
 56
 Therefore, we today decide that the statute and its accompanying legislative history, the Supreme Court decision in Morton Salt and the recent jurisprudence of Robinson-Patman secondary-line cases compel a holding that evidence of injury to a competitor may satisfy the component of competitive injury necessary to show a violation of the Robinson-Patman Act. We thus turn to specific evidence of this factor and ask whether the record is sufficient at the summary judgment stage to show competitive injury.
 
 
 57
 Injury to competition is usually shown in either of two ways: proof of lost sales or profits, Falls City Industries, supra; Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381 (8th Cir.1987), or under the Morton Salt test, proof of a substantial price discrimination between competitors over time. Under this test we keep in mind the Supreme Court's instruction that a showing that price discrimination influenced resale prices is itself adequate to show competitive injury. 334 U.S. at 47, 68 S.Ct. at 828-29.
 
 B.
 Lost Sales or Profits
 
 58
 It is not contested by Serv-A-Portion that there is a slight difference in prices offered to Weis, Tartan Foods and Sky Brothers than to those offered to Feeser. To demonstrate how this price differential equated to proof of lost sales or profits, Feeser first proffered excerpts from depositions of its employees.[11] Our de novo analysis of the depositions reveals sufficient admissible evidence of lost sales and profits to meet the burden of the non-movant in a summary judgment proceeding.
 
 
 59
 Generally, the sales people testified concerning transactions with a number of their end user customers when they either lost sales of Serv-A-Portion products to Weis Markets or were forced to greatly reduce their prices of the products, because of their inability to match their competitor's prices. For instance, Paul Thuss testified that after 10 years of conducting business with a Holiday Inn, he lost Serv-A-Portion product sales to Weis Markets. The manager of the institution told Thuss that the reason he switched to Weis was that Thuss' prices were "way out of line with [Serv-A-Portion] products--I'm buying them from your competitor."
 
 
 60
 Kevin Fox discussed transactions occurring at the Arlington Diner. He testified that for a period of time he was forced to reduce his prices on Serv-A-Portion products to compete with Weis Markets and then eventually lost the sales because of his inability to match Weis Markets' prices.
 
 
 61
 Richard Miller related in his deposition that he had problems selling portion-controlled products at the Old Maine Restaurant where Juniata and Weis Markets were the main purveyors of Serv-A-Portion goods because he "got blown out of there on price." Miller additionally testified that his inability to match the prices on Serv-A-Portion products resulted in the loss of his business integrity with that particular customer.
 
 
 62
 Describing his dealings with a hospital in Harrisburg concerning Serv-A-Portion products, William Monteith stated that Weis Markets "just knocked our socks off as far as price on Serv."
 
 
 63
 In addition, although the sales people could not testify to the prices paid by Weis Markets for the portion-controlled products purchased from Serv-A-Portion, on a number of occasions where they were shown Weis' invoices, the paperwork revealed that Weis Markets' prices offered to the consumer were lower than Feeser's cost from Serv-A-Portion. Although this does not constitute direct testimony from the salesmen that Serv-A-Portion's pricing policies favored Weis and were detrimental to Feeser's ability to sell Serv-A-Portion's products, this is a reasonable inference which must be drawn in Feeser's favor.
 
 
 64
 Verification of the information contained in the depositions was presented through affidavits of some of the sales people which were more specific than the depositions that the reason why Feeser either lost sales or incurred reduced profits was because of the lower prices offered to customers by Weis Markets, Tartan Foods and Sky Brothers.[12]
 
 
 65
 In his affidavit, Donald Fuller averred that while attempting to sell Serv-A-Portion products at a Holiday Inn, his prices were so divergent from those of Weis Markets that, although he initially offered to reduce the price of the products, he later did not even attempt to sell the goods because of his fear of losing credibility. He testified that a similar circumstance precluded him from selling Serv-A-Portion products at a Quality Inn.
 
 
 66
 Robert Andrews elaborated upon deposition testimony in his affidavit and stated that he did not get the sale of Serv-A-Portion products at the Camp Streamside account because Sky Brothers offered the products to this account at extremely low prices. Furthermore, Andrews testified that whenever he did make a sale of Serv-A-Portion products at this account it was only because he reduced his margins substantially.
 
 
 67
 Andrews also discussed his transactions at Emil's Diner where he lost sales of Serv-A-Portion products to Sky Brothers despite reducing his profit margin substantially. He related that the buyer at Emil's notified him that Feeser's prices were too high even with the markdown.
 
 
 68
 Richard Miller, in an affidavit, asserted that he was told by the buyer of Fye's Frosty Cup that Fye's would not buy Serv-A-Portion products from Miller because it received a lower price from Weis Markets.
 
 
 69
 The evidence we find most persuasive is that of the customers of Feeser, corroborating the sales personnel's testimony, that the reason Feeser lost sales was because its prices for Serv-A-Portion products were not competitive.
 
 
 70
 For example, one customer-owner of a restaurant, Dean Spanos, testified that prior to 1986 it was his custom to challenge Feeser's prices on Serv-A-Portion products, by informing Feeser that Weis Markets and Sky Brothers were charging much lower prices for the same products. Spanos related that despite Feeser's sales people's efforts, they were unable to match or better the prices and Spanos decided consistently then to throw his Serv-A-Portion business the way of Weis and Sky.
 
 
 71
 Feeser also presented deposition testimony from Wilbur Blew, a buyer from one of its largest customers, M.W. Wood. Blew testified that in a five-month period in 1984 Feeser's pricing on Serv-A-Portion products was consistently out of line with the prices being offered by Tartan Foods. According to Blew, Feeser eventually reduced its prices in a substantial manner to make the sale of Serv-A-Portion products. Blew indicated that if Feeser had not effectuated this reduction, all of its business with M.W. Wood would have been jeopardized.
 
 
 72
 William Kotsalos, a buyer for Bill's Restaurant, testified in his affidavit that in the overwhelming majority of instances when he wished to purchase portion-controlled products, he would place his order with Sky Brothers because Feeser's prices for Serv-A-Portion products were much higher.
 
 
 73
 Examining all of these submissions, we do not conclude, as Serv-A-Portion urges, that the evidence could be summed up as demonstrating de minimis violations of the Robinson-Patman Act.[13] In a similar case, Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381 (8th Cir.1987), the plaintiff company's president testified that his company had to reduce its prices in response to low price offers made by its competitors. As in the dispute before us, the plaintiff presented depositions from its sales force concerning the necessity to reduce prices. The Court of Appeals for the Eighth Circuit found that this type of evidence alone is sufficient to allow a reasonable jury to find competitive injury. Also, as stated by the Supreme Court in Falls City, where the defendant had argued that other factors may have impacted on lost sales, the Court said that "[i]f some of [plaintiff's] injury was attributed to the price discrimination, [the defendant] is responsible to that extent." 460 U.S. at 437, 103 S.Ct. at 1290. The depositions and affidavits submitted by Feeser, demonstrating actual instances of lost sales because of its inability to match its competitors' prices on Serv-A-Portion products, go well beyond the level of speculative injury unprotected by section 2(a). The record suffices to raise the inference, at this stage of the proceedings, that the price difference in the Serv-A-Portion products resulted in a reasonable possibility of harm to competition.
 
 
 74
 The evidence proffered by Feeser, if believed by the trier of fact, would support a finding that competitive harm has occurred.
 
 Price Difference Over Time
 
 75
 Although our conclusion concerning the sufficiency of this evidence of lost sales and profits alone necessitates remand to the district court on the Robinson-Patman claim, we nonetheless examine the report submitted by Feeser's expert, Dr. Robert Larner, in the context of whether it too could support a Robinson-Patman claim by invoking the Morton Salt inference of substantial price difference over a period of time.
 
 
 76
 The presumption of the requisite adverse competitive effects contemplated by section 2(a) is most likely to arise when the price differential is (1) substantial enough to influence a disfavored customer's resale prices; see FTC v. Morton Salt, 334 U.S. at 47, 68 S.Ct. at 828-29; or (2) occurs in a market with low profit margins and intensive competitive conditions; see Standard Motor Products, Inc. v. FTC, 265 F.2d 674 (2d Cir.), cert. denied, 361 U.S. 826, 80 S.Ct. 73, 4 L.Ed.2d 69 (1959). The evidence presented by Feeser's sales personnel is probative of the fact that Feeser was forced to reduce its prices to compete with Weis. Also, the parties agree that the type of market in which it competes is characterized by "low profit margins and intensive competitive conditions." Thus, here the presumption of adverse competitive effects arises and poses a question of fact as to whether Feeser was injured by Serv-A-Portion's pricing policies.
 
 
 77
 We turn then to the amount and degree of the price discrimination--significant factors used to determine the substantiality of secondary line competitive injury. "A substantial price differential may not by itself be indicative of the requisite injury. Other factors such as the duration and type of the differentials and the nature of the industry may transform a discrimination which is substantial in amount into one which is insubstantial in effect." J.O. Von Kalinowski, 5 Antitrust Laws and Trade Regulation Sec. 31.01 (1989).
 
 
 78
 Dr. Larner's report, which the district court found unpersuasive,[14] tabulated for the period 1982 through 1985 the percentage of times Feeser paid a higher price for Serv-A-Portion products than did Weis and the magnitude of this price difference. Appendix A of this opinion sets out Dr. Larner's analysis in full, but we note with specificity here the year 1983 in which Feeser paid 22% more for Serv-A-Portion products than did Weis Markets. When Weis paid the higher price, it paid 9% more. In the remaining years, when Feeser received the disfavored price, it paid less than when Weis received the disfavored price; yet the number of times when Weis received the favored price were far greater than those instances in which Feeser received the favored price.
 
 
 79
 The comparisons of the Serv-A-Portion transactions in 1984 between Feeser and Tartan Foods and Feeser and Sky Brothers are more dramatic. In that year Feeser paid a higher price for Serv-A-Portion products approximately 80% more often than did Tartan and approximately 75% more often than Sky. When Sky received the favored price, it was 24% lower than the price offered Feeser. In comparison, on the few occasions when Feeser received the favored price, it was only 9% lower than the disfavored prices. Similar, though not as disparate, figures characterize the magnitude of the price difference for Serv-A-Portion products between Feeser and Tartan. See Appendix A.
 
 
 80
 Another compelling factor considered by courts in determining competitive injury at the customer level is the duration of the price discrimination. Generally, the longer the duration, the more likely injury will be found. See Rose Confections, Inc., 816 F.2d at 385 (seller absorbed freight costs to favored customer's plant for two years); Hasbrouck v. Texaco, 842 F.2d at 1041 (price differential in effect for several years). The four-year period analyzed by Dr. Larner's report establishes the requisite duration of price discrimination to support an inference of competitive injury.[15]
 
 
 81
 We conclude that Dr. Larner's report also presents a question of material fact of competitive injury to Feeser caused by Serv-A-Portion's pricing. For four years, Weis Markets received favored pricing a significant number of times and of a magnitude in a market where the parties acknowledge that customer loyalty is compromised at two cents a case. And, for the one year in which discovery was permitted in regard to Tartan Foods and Sky Brothers, the numbers demonstrate that they too were the benefactors of favorable pricing.
 
 
 82
 Thus, under both tests, proof of lost sales or profits and substantial price difference over time, the record is adequate to defeat the summary judgment motion concerning whether section 2(a) has been violated.
 
 IV.
 
 83
 Because the record evidence supports the existence of a question of harm to competition under section 2(a), we direct our inquiry to the extent of actual injury incurred under section 4. J. Truett Payne, 451 U.S. at 562, 101 S.Ct. at 1927.
 
 
 84
 While injury to competition dominates concern in demonstrating a section 2(a) violation, to recover under section 4 a plaintiff must prove a causal connection between the price discrimination and actual damage suffered. Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969). This actual damage requirement has been construed to impose a burden of proof greater than for a section 2 violation, since under that preventative section, evidence need only establish that injury may result. J. Truett Payne, 451 U.S. at 562, 101 S.Ct. at 1927. The plaintiff's proof of damages is facilitated by the rule that once the plaintiff has met its burden of proving the fact of damage, some uncertainty with respect to the amount of damages will not preclude recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (under Sherman Act). The Supreme Court's traditional rule concerning the exactitude required in proving damage is that antitrust plaintiffs are excused from " 'an unduly rigorous standard of providing antitrust injury.' " Texaco v. Hasbrouck, --- U.S. at ----, 110 S.Ct. at 2550-51, quoting J. Truett Payne, 451 U.S. at 565, 101 S.Ct. at 1929.
 
 
 85
 The Supreme Court rejected the so-called automatic damage theory, that a jury could be permitted to infer the requisite injury and damage under Sec. 4 from a showing of substantial price discrimination, in J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. at 561, 101 S.Ct. at 1926. While the Supreme Court has lessened the stringency of proof requirements under Sec. 4 because of the difficulties of showing exactly what position the plaintiff would have been in absent the defendant's violations of the antitrust laws, id. at 566-67, 101 S.Ct. at 1929-30, at least some attempt to link the discrimination to harm to the plaintiff must be made. In Hasbrouck, the Court of Appeals for the Ninth Circuit held that damages may not be based on the amount of discrimination, but on estimates of plaintiffs' sales absent the discrimination. 842 F.2d at 1043 quoting J. Truett Payne, 451 U.S. at 557, 101 S.Ct. at 1923 (damages awarded on plaintiff's estimate of possible sales minus the violation), citing Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 123-24, 89 S.Ct. 1562, 1576-77, 23 L.Ed.2d 129 (1969);[16] see also Edward J. Sweeney and Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 118-119 n. 6 ("the amount of illegal discrimination can only be used to quantify damages if the plaintiff demonstrates that favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received.").
 
 
 86
 The less than stringent proof requirements of Sec. 4 are satisfied here by (a) the direct evidence of lost sales discussed supra (b) the evidence that the substantial price discrimination reflected in the resale prices of Feeser and the favored competitors directly resulted in Feeser losing certain sales and losing profits on other sales because it had to cut its margins and (c) Dr. Larner's expert report outlining the magnitude of the price difference. Although Dr. Larner's report did not take the next step and estimate the amount, in dollars and cents, of damages incurred as a result of the price difference, discovery was not extended to this point of calculation.
 
 
 87
 We recognize that an inference may be drawn, from the wording of the statute, that de minimis violations are not actionable: the effect of a price discrimination must be substantially to lessen competition. Feeser has, however, by the evidence proffered through the depositions and affidavits and Dr. Larner's report, met its burden of establishing a genuine issue of fact far above the de minimis level as to the existence of the element of the extent of injury caused by Serv-A-Portion's pricing policies to defeat the entry of summary judgment against it.
 
 V.
 Sherman Act
 
 88
 Section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1914), provides, in pertinent part, as follows:
 
 
 89
 Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several States ... is declared to be illegal....
 
 
 90
 15 U.S.C. Sec. 1. As with the Robinson-Patman Act, for activity to be actionable under the Sherman Act it must result in the type of injury the antitrust laws were intended to prevent and must flow from that which marks the defendant's acts as unlawful. Atlantic Richfield Co. v. USA Petroleum Co., --- U.S. ----, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).[17] As distinguished from the Robinson-Patman Act, the target of this antitrust law is "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 329, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962). See Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 887 (9th Cir.1982) ("the Supreme Court has recognized that the price discrimination that results where buyers seek competitive advantage from sellers encourages the aims of the Sherman Act, a respect in which the Sherman Act is inconsistent with the aims of the Robinson-Patman Act ... while appellants point to injury to their particular business, they do not make the necessary showing of a substantially adverse effect on competition in the record market in general" to sustain a Sherman Act claim).
 
 
 91
 In Tunis Brothers Co. v. Ford Motor Co., 763 F.2d 1482 (3d Cir.1985), vacated, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986), on remand, 823 F.2d 49 (1987), cert. denied, 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988), we found the following four elements necessary to sustain a successful Sherman Act violation:
 
 
 92
 (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.
 
 
 93
 Id. at 1489.
 
 
 94
 In Tunis, on remand from the Supreme Court, we addressed the standard to be employed by district courts on summary judgment motions in antitrust conspiracy cases in light of the Court's then recent decision in Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Particularly relevant to us in Tunis Brothers, and of equal importance in the matter sub judice, was the Court's statement in Matsushita that:
 
 
 95
 [I]f the antitrust defendant's conduct is consistent both with permissible competition and illegal conspiracy, evidence of such conduct 'does not, standing alone, support an inference of antitrust conspiracy.' 475 U.S. at 589, 106 S.Ct. at 1357. In such a situation, '[t]o survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of [Sherman Act] Sec. 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.' Id. (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). In other words, such a plaintiff 'must show that the inference of [illegal] conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff].'
 
 
 96
 Tunis Brothers v. Ford Motor, 823 F.2d at 50.
 
 
 97
 Thus, under the Matsushita standard, we must decide whether the record supports a reasonable inference that Serv-A-Portion's pricing policies resulted from an illegal agreement with Weis Markets rather than independent action by Weis Markets and, if so, whether this concerted activity had an adverse impact on the overall competitive process.
 
 
 98
 The portion of the record relevant to the element of conspiracy concerns Serv-A-Portion's bid pricing and the activity by Weis Markets in utilizing this system to its advantage. To render a determination as to the possible inference to be drawn from this evidence, however, whether it be consistent with independent or concerted illegal action, would constitute speculation.
 
 
 99
 The current record does not disclose the element of illegal conspiracy necessary to sustain a Sherman Act violation. We note that Feeser was instructed by the district court's order to confine its discovery request to competition and injury between itself and other food distributors. As we have recognized, proof of a Sherman Act violation requires the additional element of an illegal conspiracy to exclude a competitor from the market. Feeser, to date, has not had an adequate opportunity to explore the possible existence of this essential element of a Sherman Act claim.[18] Discovery in this case was limited to competitive impact and injury and although we have concluded that Feeser, as the non-movant, has met its burden of producing sufficient evidence to sustain its burden of proof of these elements under the Robinson-Patman Act, we are ill-equipped to render a similar determination under the Sherman Act.
 
 
 100
 Our inquiry concerning the sufficiency of the evidence to sustain a Sherman Act violation does not end here. We must pursue the issue we found immaterial to our Robinson-Patman discussion--has the activity under scrutiny had the requisite anti-competitive effect on the food distribution industry? In this market competition is intense and we must decide whether, within this purview, there is sufficient evidence to demonstrate a question of fact as to whether the vitality of the competition among the participants in the market has been dissipated.
 
 
 101
 The injury to Feeser has already been discussed.
 
 
 102
 In addition to the uncontested fact that Serv-A-Portion offered different prices to Feeser than it did to Weis, Tartan Foods and Sky Brothers, the record also reveals discriminatory pricing to other non-party competitors as well. Joanne Straw testified by affidavit that her company, W.R. Straw, Inc., lost sales of Serv-A-Portion products to Pennsylvania State University because Weis Markets' prices to Penn State were lower than Straw's costs from Serv-A-Portion. Joseph Spagnola, a buyer for R & R Provision Company, another participant in the relevant market, testified that he received complaints from his salespeople that they were losing sales of Serv-A-Portion products to Weis Markets because R & R's prices were too high. His investigation revealed that Weis' resale prices on Serv-A-Portion products were as low as R & R's costs for identical Serv-A-Portion products. We are aware that the district court rejected this testimony because it constituted hearsay based upon information from Spagnola's salespeople, but the district court erred in this regard.
 
 
 103
 In Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir.1989), we noted that Fed.R.Civ.P. 56(e) requires the production, at the summary judgment stage, of evidence " 'as would be admissible at trial' ... and thus 'reduc[ible] to admissible evidence.' " Id. 466 at 12. We cited Celotex v. Catrett, however, in which the Supreme Court rejected the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. 477 U.S. at 324, 106 S.Ct. at 2553. We thus concluded that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that "would be admissible at trial." Williams, 891 F.2d at 465-66 n. 12. Here, there is no indication that Spagnola's salesforce would be unavailable to testify at trial. The averments of Spagnola's affidavit are capable of proof through admissible evidence and we will consider them now on de novo review.
 
 
 104
 Reviewing these affidavits, we conclude that Feeser has presented sufficient evidence to raise the inference that competition has been harmed by Serv-A-Portion's discriminatory pricing practices. When three participants in a limited market aver that they were unable to sell their products to customers because other favored competitors were offering better prices to these customers based on lower costs from Serv-A-Portion, damage to the vitality of the market has been adequately demonstrated for summary judgment purposes. Feeser's demonstration of an overall anti-competitive impact, in combination with the limited opportunity for discovery, compels us to vacate the grant of summary judgment on this Sherman Act claim and to remand to permit further discovery.
 
 VI.
 
 105
 As described in the complaint, Juniata Foods, Inc., is a food distribution business located in Lewistown, Pennsylvania. Juniata is commonly owned with Feeser.
 
 
 106
 The district court, in a footnote, dismissed Juniata from the lawsuit because it accepted the contention of Serv-A-Portion that Juniata never purchased products directly from Serv-A-Portion. The court determined that the law of this circuit dictates that the plaintiff be a direct purchaser before it may assert a Robinson-Patman claim.
 
 
 107
 Our controlling cases on this question of standing are Klein v. Lionel Corp., 237 F.2d 13 (3d Cir.1956) and Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). In Klein, the district court granted summary judgment in favor of the defendant on the ground that because the plaintiff retailer bought the defendant's products through wholesalers and jobbers, it had no cause of action against the defendant. We affirmed, holding that a retailer who purchased electric toy trains and accessories from a middleman was not a "purchaser" within the meaning of the Clayton Act. Id. at 15. We subsequently affirmed our holding in Klein in Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d at 122, when we dismissed claims for damages against the seller by companies who purchased goods only from a direct buyer of the defendant-seller and not directly from the defendant itself.
 
 
 108
 Although the district court correctly stated the law of standing, we note that the record does not resolve the question of whether Feeser was in fact an indirect purchaser. Feeser points to evidence proffered by it that Juniata had for many years acquired Serv-A-Portion products with Serv-A-Portion's full knowledge and consent by consolidating its purchases with those of its sister corporation, Feeser. Feeser characterized this aspect of its relationship with Juniata as that of a purchasing agent. Specifically, Feeser refers to the affidavit of John M. Tighe, the controller of both Feeser and Juniata.[19] Tighe avers that Feeser and Juniata are managed by an identical core of senior executives ultimately responsible to a single individual, Lester Miller, the president and sole shareholder of both companies. Tighe then claims that in 1975, Serv-A-Portion agreed with Feeser and Juniata that in order to maximize efficiency all shipments of Serv-A-Portion products would be delivered to Feeser in Harrisburg and all invoices would be billed through a centralized selling and shipping system. Accompanying this system, according to Tighe, was an understanding that a portion of the products sent to Feeser would be redelivered by Feeser to Juniata.
 
 
 109
 Serv-A-Portion asserts that certain invoices indicate that not only did Juniata buy Serv-A-Portion products from Feeser, but that it paid a premium price for the products acquired from Feeser. Serv-A-Portion argues that to credit Juniata's classification as anything other than as an indirect purchaser is legally indefensible as it would result in a spread of Robinson-Patman liability throughout the distribution chain.
 
 
 110
 A material fact here is the method by which Juniata acquires its portion-controlled products from Serv-A-Portion. Although the Tighe affidavit is persuasive, the record presents conflicting evidence. Thus, this question of Juniata's standing was improperly resolved at the summary judgment stage and Juniata will be reinstated as a party plaintiff in this litigation.
 
 VII.
 Conclusion
 
 111
 The order of the district court granting summary judgment in favor of Serv-A-Portion will be vacated and the case remanded for further proceedings consistent with this opinion. The pendent state claims, dismissed because the federal question claims were resolved, will be reinstated.
 
 
 112
 APPENDIX A
 FEESER & WEIS
 Feeser Feeser Feeser
 Paid Paid and
 Higher Lower Weis
 Price Price Paid
 than than Same
 Weis Weis Price # of
Year (%) (%) (%) Comparisons
1982 51.10 14.84 34.07 182
1983 63.18 15.92 20.90 201
1984 61.00 29.88 9.13 241
1985 * 66.67 23.15 10.19 216
* The 1985 figures include January of 1986.
 FEESER & TARTAN
3 Feeser Feeser Feeser
 Paid Paid and
 Higher Lower Tartan
 Price Price Paid
 than than Same
 Tartan Tartan Price # of
Year (%) (%) (%) Comparisons
1984 79.38 14.4 6.23 257
 FEESER & SKY BROTHERS
 Feeser Feeser Feeser
 Paid Paid and
 Higher Lower Sky
 Price Price Bros.
 than than Paid
 Sky Sky Same
 Bros. Bros. Price # of
Year (%) (%) (%) Comparisons
1984 74.72 19.10 6.18 178
 Magnitude of Price Difference
 Feeser & Weis Feeser & Sky Bros. Feeser & Tartan
 % by % by % by % by % by % by
 which which which which which which
 Price to Price to Price to Price to Price to Price to
 Feeser Weis Feeser Sky Bros. Feeser Tartan
 Exceeded Exceeded Exceeded Exceeded Exceeded Exceeded
 Price to Price to Price to Price to Price to Price to
Year Weis Feeser Sky Bros. Feeser Tartan Feeser
1982 0.09 0.11
1983 0.22 0.09
1984 0.15 0.15 0.24 0.07 0.20 0.12
1985* 0.11 0.16
* The 1985 figures include January of 1986.
(Doc. No. 142, Exhibit C).
 STAPLETON, Circuit Judge, concurring and dissenting:
 
 
 113
 I agree with the court that the defendants were not entitled to summary judgment on the plaintiffs' secondary-line Robinson-Patman Act claim. However, I respectfully dissent from the court's reversal of the summary judgment in favor of the defendants on plaintiffs' Sherman Act claim. Because Feeser has not met its burden of producing evidence tending to show that the challenged price discrimination affected competition in a relevant market as required under Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1, I would affirm the summary judgment entered against Feeser on its second claim.
 
 
 114
 As the court finds, the language of Sec. 2(a) of the Robinson-Patman Act, its legislative history, and Supreme Court precedent interpreting it compel the conclusion that a victim of secondary line price discrimination may show "competitive injury" regardless of the general health of the victim's business or the market in which the victim operated. Moreover, as the court's opinion also demonstrates, Feeser met its burden of producing evidence tending to show a reasonable possibility that Serv-A-Portion's discriminatory pricing practices are harmful to competition between Feeser and the beneficiaries of that discrimination. Falls City Industries, Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 434-35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). It did this both by presenting direct evidence of lost sales, and by producing sufficient evidence of a substantial price discrimination between itself and its competitors over time, so as to implicate the Morton Salt inference. Id. In the latter regard it is especially significant that Feeser has produced evidence indicating that Serv-A-Portion's discriminatory pricing was passed on by its favored distributors in the form of lower resale prices. FTC v. Morton Salt, 334 U.S. 37, 47, 68 S.Ct. 822, 828-29, 92 L.Ed. 1196 (1948) (a showing that price discrimination was sufficient in amount to influence resale prices was "in itself ... adequate to show competitive injury"). Finally, by its evidence of lost sales alone, Feeser has produced sufficient evidence to meet its burden at the summary judgment stage of creating a genuine issue of material fact as to whether the challenged price discrimination actually injured it for purposes of Sec. 4 of the Clayton Act. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) (the "burden of proving the fact of damage under Sec. 4 of the Clayton Act is satisfied by ... proof of some damage flowing from ... [the antitrust violation]; inquiry beyond this point goes only to the amount and not the fact of damage"); Falls City, 460 U.S. at 437, 103 S.Ct. at 1290 (if some of a plaintiff's injury is attributable to price discrimination, defendant is responsible to that extent).[1] I also agree that there is a genuine dispute as to whether Juniata can be considered a "purchaser" with standing to sue under our precedent in Klein v. Lionel Corp., 237 F.2d 13 (3d Cir.1956), and Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), and that the district court therefore erred in entering summary judgment against Juniata on this ground.
 
 
 115
 I part company with the court, however, when it concludes that Feeser has tendered sufficient evidence to raise a genuine issue of material fact as to whether the price discrimination at issue in this case caused an adverse, anticompetitive effect in a relevant market for purposes of Sec. 1 of the Sherman Act. To the contrary, Feeser failed to make any significant response to Serv-A-Portion's summary judgment argument that Feeser was unable to show an injury to competition in a relevant market. In particular, Feeser introduced no market analysis of any kind purporting to show that Serv-A-Portion's discriminatory pricing arrangement with Weis (assuming such an agreement existed)[2] produced an adverse, anticompetitive effect within a relevant product and geographic market. This left the record silent about an essential element of Feeser's Sec. 1 claim.
 
 
 116
 A vertical restraint, such as an agreement between Serv-A-Portion and Weis to deal with each other on more favorable terms than Serv-A-Portion would deal with Feeser, is not a per se violation of Sec. 1, but must be dealt with under a rule of reason analysis. See Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (vertical restraints, such as an agreement between a manufacturer and a dealer to terminate another "price cutting" dealer, are not per se violations of Sec. 1 absent an agreement between the conspiring dealer and the manufacturer as to resale prices); Alliance Shippers v. Southern Pacific Transportation Co., 858 F.2d 567, 570 (9th Cir.1988) ("vertical arrangements resulting in price discrimination are not per se violations of the Sherman Act"); Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 375 (3d Cir.1985) ("that a manufacturer may give preferential pricing and delivery terms to one distributor does not establish a per se violation of section 1 of the Sherman Act even though other distributors suffer losses in sales").
 
 
 117
 Under a rule of reason analysis, a vertical restraint violates Sec. 1 only if either its purpose or its effect is to adversely affect competition in a relevant market. Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 26 (3d Cir.) ("[I]n the context of Sec. 1's prohibition of conspiracies in restraint of trade, except where practices fall under a judicially created per se ban, a finding of illegality presupposes a determination in any given case that the effect upon competition in the marketplace is substantially adverse.") (quotations omitted), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); accord Garshman v. Universal Resources Holding, Inc., 824 F.2d 223, 231 (3d Cir.1987); Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1490 (3d Cir.1985), vacated on other grounds, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986); Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 166 (3d Cir.1979); Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1346 (3d Cir.1975). Thus, unlike the Robinson-Patman Act, the Sherman Act protects competition in the marketplace and not individual competitors harmed by price discrimination. Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 529 (1st Cir.1989).
 
 
 118
 As a result, Feeser cannot defeat summary judgment by merely showing that Feeser and other disfavored distributors lost sales because Weis, Tartan and Sky were able to offer lower prices to end users of Serv-A-Portion portion control products as a result of the pricing advantage they received from Serv-A-Portion, and that Serv-A-Portion realized that this would occur. Seaboard Supply Co., 770 F.2d at 375; Monahan's Marine, Inc., 866 F.2d at 525 (where favoritism in prices for certain dealers was not likely to concentrate the relevant market or drive smaller dealers out, the fact that a disfavored dealer was harmed did not render a price discrimination agreement unreasonable under Sec. 1); Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 887 (9th Cir.1982) (indicating "that the price discrimination which results where buyers seek competitive advantage from sellers encourages the aims of the Sherman Act, a respect in which the Sherman Act is inconsistent with the aims of the Robinson-Patman Act," and affirming a grant of summary judgment against a plaintiff victimized by price discrimination where plaintiff did not show an adverse effect on competition in the relevant market), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). The Sherman Act is not offended by unfair subsidies to some competitors that result in a price war and diminished profits for some disfavored competitors, unless those subsidies lead to diminished price competition in the relevant market and higher prices for consumers. AAA Liquors, Inc. v. Joseph E. Seagram & Sons, 705 F.2d 1203, 1207-08 (10th Cir.1982) (section 1 allows a supplier to start a "price war," and does not require suppliers to offer the same prices to customers in a given geographical area, absent a purpose to exclude disfavored buyers from the relevant market or some adverse effect on competition in that market), cert. denied, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); cf. Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d at 1490 n. 13 ("[I]n addition to showing the existence of a conspiracy or combination, plaintiffs must show an adverse impact on competition to prove a section 1 claim. The termination of a dealer or rejection of a dealer application, even if done unfairly, does not by itself establish injury to competition.").
 
 
 119
 Because the Sherman Act protects competition and not competitors, Feeser had to show that the complained of price discrimination had an adverse effect on competition in a relevant market defined by product and geographic scope.[3] On the record before us, however, it would be impossible to rationally conclude that Serv-A-Portion's pricing practices were intended to[4] or were likely to lead to a substantial lessening of competition in some designated market. Indeed, there is nothing in the record indicating that the complained of price discrimination did anything other than spark a vigorous round of competition in a portion control market which was already extremely competitive. Nothing in the record indicates that disfavored distributors like Feeser could not easily transfer to another manufacturer of portion control products. The only disfavored distributor that dropped Serv-A-Portion portion control products was R & R, and R & R did not retreat from competition with Weis in the portion control market. Instead, it began to distribute other brands of portion control products, and thus increased interbrand competition in the relevant market. The fostering of just such competition is, of course, the "primary concern of the antitrust laws." Business Electronics Corp., 485 U.S. at 726, 108 S.Ct. at 1520-21.[5] Nor is this a case where a plaintiff without market power was disfavored by an agreement between a supplier and a powerful distributor who forced the agreement on the supplier so as to harm the plaintiff. There is no evidence that Feeser is smaller than Weis, or has less market power than Weis. Monahan's Marine, 866 F.2d at 529.
 
 
 120
 Rather, the only inference that could be drawn from this record would be that the discriminatory pricing was unlikely to have an adverse effect on the portion control market (1) because disfavored distributors like Feeser could easily begin to distribute other brands of portion control products; (2) because Serv-A-Portion, according to Feeser, favored not one, but three distributors of its own products and both the intrabrand competition among them and the interbrand competition in the market would prevent them from exploiting their status in a way that would hurt consumers; and (3) because there are no discernible barriers to entry to this market.
 
 
 121
 I thus conclude that the present record does not reflect a material dispute of fact as to whether the alleged agreement between Serv-A-Portion and Weis had an adverse impact on competition in a relevant market. I would affirm the judgment in favor of the defendants on the Sherman Act claim.
 
 
 
 *
 Honorable Harold A. Ackerman of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Serv-A-Portion argues mootness by contending that the lawsuit is automatically terminated by the sale of DiGiorgio's Serv-a-Portion division on May 31, 1988. Feeser counters that the action continues under the authority of Fed.R.Civ.P. 25(c) which states:
 In the case of a transfer of interest, the action may be continued against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.
 Although neither party has filed the appropriate motion, Feeser has made known its intention to present a Rule 25(c) motion to enforce its rights against Serv-A-Portion's successor. This appeal appropriately continues against Serv-A-Portion.
 
 
 [2]
 Give-away items are provided to consumers, such as diners in restaurants, at no cost. These products thus do not yield a direct return to the institution providing the items. App. at 2759
 
 
 [3]
 We refer to the plaintiffs collectively as "Feeser."
 
 
 [4]
 Section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (as amended 1980) (Supp.1990) reads:
 Except as provided in subsection (b) of this section, any person who shall be injured ... by reason of anything forbidden in the antitrust laws ... shall recover threefold the damages by him sustained....
 15 U.S.C. Sec. 15(a).
 
 
 [5]
 These distributors are not parties to the lawsuit
 
 
 [6]
 Appendix A to this opinion represents a summation of the Larner Report comparing prices paid by Feeser and Weis Markets, Tartan Foods and Sky Brothers for several Serv-A-Portion portion-controlled products
 
 
 [7]
 On appeal Weis Markets submitted a brief detailing generally its position that its decisions concerning Serv-A-Portion purchases were unilateral and not dictated by another competitor's activities. It averred that there is no evidence that it knowingly induced or received lower prices in violation of section 2(f) of the Robinson-Patman Act
 In this same vein, as to the Sherman Act allegation, Weis Markets disputes that there is any evidence of conspiracy between Serv-A-Portion and Weis which would support such a violation.
 Feeser does not specifically respond to any of Weis Markets' evidentiary contentions, but counters that Weis lacks standing to argue any point on appeal since it did not raise such issues before the district court. Because our decision vacating the grant of summary judgment in favor of Serv-A-Portion necessarily involves the disposition previously rendered in regard to Weis Markets, we need not address the argument premised on Weis' lack of standing to proceed.
 
 
 [8]
 The only evidence in the record of the amount of the difference is Dr. Larner's report, expressed in percentages. Although it does not challenge the figures, Serv-A-Portion does contend that the dollar amounts which these percentages represent are very slight
 
 
 [9]
 Although earlier decisional history of the degree of certainty needed to demonstrate actionable Robinson-Patman injury runs the semantical gambit from "reasonable possibility," see Corn Products Refining, 324 U.S. at 742, 65 S.Ct. at 969, to "reasonable probability," see Foremost Dairies, Inc. v. F.T.C., 348 F.2d 674, 680 n. 11 (5th Cir.), cert. denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965), the 1983 Supreme Court decision in Falls City confirms that a reasonable possibility that the price differential may harm competition is the appropriate standard. 460 U.S. at 434-35, 103 S.Ct. at 1288-89
 To assist in determining the meaning of reasonable possibility, one commentator suggests that "while certainty is not to be required, neither can plaintiff prove its case by mere hypothesis of competitive injury." Earl W. Kintner and Joseph P. Bauer, Federal Antitrust Law, Sec. 22.5.
 
 
 [10]
 Unfortunately the precise issue of the intended scope of the Act in regard to the targeted effect on competition was not before the Supreme Court on certiorari. The Court, however, did reference its prior reasoning in Falls City, 460 U.S. at 436, 103 S.Ct. at 1289, that "the competitive injury component of a Robinson-Patman violation is not limited to the injury to competition between the favored and disfavored purchaser; it also encompasses the injury to competition between their customers." Texaco v. Hasbrouck, --- U.S. at ----, 110 S.Ct. at 2550-51 (quoting Falls City, 460 U.S. at 436, 103 S.Ct. at 1289). Thus by inference, a showing of price discrimination between competing purchasers can suffice to satisfy the required element of injury to competition within the meaning of the Act
 
 
 [11]
 Although the district court disallowed a considerable part of this testimony as hearsay, it acknowledged that some of the excluded depositions would be admissible under Fed.R.Evid. 803(3) if the customer's motive for not purchasing from Feeser was relevant to this action. Finding that motive was not germane, the district court disallowed the bulk of the depositions. The district court erred in this regard because the reason why a customer was not doing business with a particular seller is relevant in a lost profits/sales inquiry and its causal connection to the pricing practices of the alleged violator. If Feeser was losing sales or was being forced to cut its selling prices and thereby reducing its profits to meet Weis' price, this is directly related to actual injury. See Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 914 (2d Cir.1962) ("[s]tatements of a customer as to his reasons for not dealing with a supplier are admissible for this limited purpose," i.e., the purpose of proving customer motive, but not as evidence of the facts recited as furnishing the motives); see also Hydrolevel Corp. v. Am. Soc. of Mech. Engineers, 635 F.2d 118, 128 (2d Cir.1980) (following Schwabe ); 4 J. Weinstein & M. Berger, Weinstein's Evidence p 803, at 803-112 (1988)
 There is contrary authority. In Reserve Supply Corp. v. Owens Corning Fiberglass, 639 F.Supp. 1457 (N.D.Ill.1986), it was held that deposition testimony relating conversations in which former customers told an official of the plaintiff's company that they had been purchasing [a product] from lower priced distributors was inadmissible hearsay. The district court cited no authority nor offered any rationale for its decision and, thus, we do not consider it persuasive.
 
 
 [12]
 Again, inadmissible hearsay was the reason advanced by the district court for refusing consideration of Feeser's sales force affidavits. The basis for exclusion echoed its reasoning concerning the depositions, i.e., that the reasons enunciated by the sales people for lost sales had to do with the customers' motive in not purchasing Serv-A-Portion goods from them and were therefore not relevant. We have already expressed our opinion that the customers' motive was indeed relevant
 
 
 [13]
 The cases cited by the district court to lend credence to its theory that de minimis violations are not actionable are either factually or legally distinguishable
 See Rudner v. Abbott Laboratories, 664 F.Supp. 1100 (N.D. Ohio 1987) (although court recognized that there must be more than de minimis violations in both sales and volumes, record was insufficient to analyze factual question in summary judgment motion); Hanson v. Pittsburgh Plate Glass Industries, Inc., 482 F.2d 220, 224 (5th Cir.1973), cert. denied, 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761 (1974) (de minimis sales occurred, when as courtesy one distributor extended to another item not in stock); Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163 (7th Cir.1978) (question existed whether defendant possessed valid exclusive right to compete in certain geographic area; also, plaintiff unable to identify extent of possible customer dealings or estimate sales actually lost); Whitaker Cable Corp. v. FTC, 239 F.2d 253 (7th Cir.1956), cert. denied, 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1957) (manufacturer selling to 8 1/2% of participants in market and who charged different prices to its customers without justification for differential was engaging in activity violative of the Act); Uniroyal, Inc. v. Hoff and Thames, Inc., 511 F.Supp. 1060 (S.D. Miss.1981) (sales, with $200 combined value, to three customers were de minimis); Dairy King, Inc. v. Kraft, Inc., 645 F.Supp. 126 (D.Md.1986) (lower prices offered to certain purchasers were in form of discounts offered to first time customers).
 
 
 [14]
 In most respects, the district court dismissed the opinion of the expert. Although it did not exclude Dr. Larner's report specifically, it rejected each and every one of its contentions outright. The district court erred first, as it did not make the requisite finding as to whether or not this is the sort of data relied upon experts and Dr. Larner's field in conducting pricing analyses, see Indiana Coffee Corp. v. Proctor & Gamble Co., 752 F.2d 891 (3d Cir.1985), and second, because the uncontested figures actually do indicate substantial price discrimination over time. It is clear enough from recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)
 
 
 [15]
 Feeser's economist, Dr. Larner, also prepared an analysis comparing the average price paid by Weis and Feeser for six key Serv-A-Portion products for a six-month time period in 1984. The products used were identified by Weis as being particularly important in the portion control market, and the time period selected was, according to Larner, a conservative one during which he believed that the extent of the price discrimination against Feeser, and in favor of Weis, was not as great as in other relevant time periods. His analysis revealed that Weis received lower prices than Feeser on five of these six key products, and that Weis' resale prices were lower on each of the five products than were Feeser's even though Weis had a higher margin than Feeser on four of the products. Thus, Larner's analysis is capable of supporting the inference that, for this six-month period, Weis was passing on some of the savings it received from Serv-A-Portion, savings that allowed it to charge a lower resale price than Feeser while retaining a higher profit margin. As such, this analysis, especially when coupled with evidence that Weis' cost was the basis for its selling price to customers, is highly probative of competitive injury, see Morton Salt, 334 U.S. 37, 47, 68 S.Ct. 822, 828-29, 92 L.Ed. 1196 (1948) (a showing that price discrimination was sufficient in amount to influence resale prices was "in itself ... adequate to show competitive injury"); and bolsters the evidentiary force of the testimony of Feeser's sales people, and Larner's own less detailed pricing analysis for years 1982-1985
 
 
 [16]
 To estimate its lost sales at trial, Hasbrouck's expert presented a market analysis comparing Hasbrouck's actual prices, volumes and profits to its estimated amount absent the discrimination. The expert utilized economic projections based upon various assumptions such as assuming Texaco did not offer a favored price to its competitors and assuming that Texaco lowered its price to Hasbrouck
 On appeal, the Supreme Court decided that:
 [e]ven if some portion of some of the respondent's injuries may be attributable to the conduct of independent retailers, the expert testimony nevertheless provided a sufficient basis for an acceptable estimate of the amount of damages.
 Hasbrouck, --- U.S. at ----, 110 S.Ct. at 2550-51.
 
 
 [17]
 The goals of the Sherman Act and the Robinson-Patman Act also do not mirror one another. In Great Atlantic & Pacific Tea Co. v. FTC, 440 U.S. 69, 82, 83 n. 16, 99 S.Ct. 925, 934, 934 n. 16, 59 L.Ed.2d 153 (1979), the Supreme Court noted that price discrimination with advantageous results for buyers versus a competitive edge for sellers encourages the aims of the Sherman Act, and in that respect, can be viewed as inconsistent with the Robinson-Patman Act
 
 
 [18]
 The dissent notes that the dismissal of Feeser's Sherman Act claim could be affirmed because Feeser's Rule 56(f) affidavit did not adequately outline the additional evidence necessary to demonstrate the presence of the conspiracy. Diss. Op. at 1546 n. 2. Although the dissent correctly states the law of specificity concerning Rule 56(f) affidavits, it is not applicable here. At Serv-A-Portion's request, the district court limited discovery to the elements of competitive injury. Serv-A-Portion's summary judgment motion was directed only to the issue of damage to competition. It would be unfair to impose upon Feeser an obligation to specify the type of evidence it needed to uncover to substantiate the conspiracy element of its Sherman Act claim when it was without notice that the district court intended to consider and resolve the entire Sherman Act claim
 
 
 [19]
 Serv-A-Portion moved to strike the Tighe affidavit. In its order granting summary judgment, the district court dismissed, save one, all of Serv-A-Portion's motions to strike as moot. In light of our decision that there exists material issues of fact, the findings of mootness concerning the evidentiary questions, newly viable, are necessarily dissolved
 
 
 [1]
 I cannot agree with the court's suggestion that there are "de minimis violations" of the Robinson-Patman Act that do not count as such. I acknowledge that circumstances may exist where price differentials are so de minimis that they could not create a reasonable possibility that competition between the favored and disfavored purchasers would be harmed. Where, however, " 'the record indicates a price differential substantial enough to cut into the purchaser's profit margin ... [or one] that, if reflected in a resale price cut, would have a noticeable effect on the decisions of customers in the retail market, an inference of injury may be properly indulged.' " Boise Cascade Corp. v. FTC, 837 F.2d 1127, 1153 (D.C.Cir.1988) (Mikva, J. dissenting) (quoting Foremost Dairies, Inc. v. FTC, 348 F.2d 674, 680 (5th Cir.1965))
 
 
 [2]
 As was the district court, I am willing to assume, for purposes of analyzing whether Feeser has produced sufficient evidence of adverse competitive impact under Sec. 1 of the Sherman Act, that the agreement alleged in Feeser's complaint existed, i.e., a conspiracy between Serv-A-Portion and Weis whereby Weis would receive more favorable prices than Feeser. However, if an independent ground for affirmance were not available, affirmance might well be appropriately based on the lack of record evidence of a conspiracy, given that discovery in this case went on for over a year prior to the order limiting discovery to issues of competitive injury, and Feeser's Rule 56(f) affidavit did not indicate what additional discovery it needed to uncover evidence of an illegal agreement. See Dowling v. City of Philadelphia, 855 F.2d 136 (3d Cir.1988) ("This court has interpreted Rule 56(f) as imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained."); see also, Hancock Industries v. Schaeffer, 811 F.2d 225, 230 (3d Cir.1987); Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir.1986); Mid-South Grizzlies v. National Football League, 720 F.2d 772, 781 (3d Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). Feeser was well apprised of the need to produce adequate evidence on this element of its claim, and filed a, albeit inadequate, Rule 56(f) affidavit to respond to this portion of Serv-A-Portion's motion
 
 
 [3]
 The record is unclear as to the precise geographic area allegedly affected by the unlawful agreement alleged by Feeser. Nor is it apparent whether Feeser contends that the product market is all portion control products or whether it contends that Serv-A-Portion portion control products can in themselves constitute a product market for Sec. 1 purposes. Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 27 (3d Cir.1978), (quoting Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523-24, 8 L.Ed.2d 510 (1962)) ("The outerbounds of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Feeser does advance the proposition that Serv-A-Portion products occupy a unique niche in the portion control market because of their combination of moderate price and good quality. This proposition suggests that if Serv-A-Portion's distributors fail to maintain their prices at a reasonable level, end users will either switch to higher quality products (made price competitive because of Serv-A-Portion's increased prices) or considerably cheaper products (the rise in Serv-A-Portion's prices not being justified by the quality difference between its products and cheaper ones)
 
 
 [4]
 With respect to intent, Feeser's amended complaint alleges only an agreement to engage in price discrimination, and does not allege that this agreement was designed to drive it from the portion control product market altogether. Compare Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1347 (3d Cir.1975) ("A combination of distributors, which through unfair practices eliminates a competitor and leaves it in such a condition that it lacks the ability to continue business as an interbrand competitor, has an adverse effect on competition.")
 In its briefs to the district court and this court, Feeser has, at best, vaguely alleged that Serv-A-Portion intended to hamper Feeser's ability to compete with Weis in sales of Serv-A-Portion's portion control products. No record evidence supports this assertion, however. Further, the proposition that Serv-A-Portion would intend to do this seems facially implausible. As Judge Breyer has explained, a "supplier himself typically has an economic interest in encouraging competition among his dealers, and thus preventing the emergence of any 'dealer monopoly.' Other things being equal, a profit-maximizing dealer monopolist would set retail prices that, from the supplier's perspective, are too high and unduly restrict the product's sales." Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 526 (1st Cir.1989); see also Continental T.V. Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 56 & n. 24, 97 S.Ct. 2549, 2560 & n. 24, 53 L.Ed.2d 568 (1977) (indicating that economists believe that once a manufacturer sets its own price, the manufacturer desires intrabrand competition among its distributors since this leads to lower retail prices and increased sales). Most important, as I discuss infra, even if Serv-A-Portion intended to give Weis an unfair advantage over Feeser, this would not violate Sec. 1 unless it was part of a plan to cause some adverse effect on competition in a relevant market. The Sherman Act is not designed as a general prohibition on unfair business practices, it is designed to protect consumers and absent some purpose to harm them or some adverse effect upon their interests, the Act is not concerned with harm to a particular competitor.
 
 
 [5]
 Continental T.V. Inc. v. GTE Sylvania, Inc., 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19 ("Interbrand competition is the competition among the manufacturers of the same generic product ... and is the primary concern of antitrust law.... The degree of intrabrand competition is wholly independent of the level of intrabrand competition confronting the manufacturer. Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand competition among the distributors of a product produced by a firm in a highly competitive industry. But when interbrand competition exists ... it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.")