**Sharon K. SARKO, Plaintiff,**

v.

**PENN–DEL DIRECTORY CO., Defendant.**

**Civil Action No. 96–4428.**

United States District Court, E.D. Pennsylvania.

July 9, 1997.

Donald P. Russo, Allentown, PA, for Plaintiff.

Imogene E. Hughes, Kleinbard, Bell & Brecker, Philadelphia, PA, Stephen B. Wiley, Wiley, Malehorn and Sirota, Morristown, NJ, for Defendant.

## MEMORANDUM

JOYNER, District Judge.

Plaintiff Sharon K. Sarko ("Plaintiff") alleges in this action that Defendant Penn–Del Directory Co. ("Penn–Del" or "Defendant") discharged her in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–1 et seq., the Americans with Disabilities Act ("ADA"), § 12101 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Con. Stat. Ann. §§ 955 and 962. Defendant moves for summary judgment on all four claims. For the following reasons, the Motion is granted in part and denied in part.

## BACKGROUND

Defendant sells and services the advertising that appears in the yellow pages of telephone books published by Bell Atlantic–Pennsylvania. Plaintiff was a telephone sales representative in Penn–Del's office in Bethlehem, Pennsylvania, from 1991 to 1994. What follows are the facts viewed in the light most favorable to Plaintiff, with every reasonable inference drawn in her favor. We recite the facts in considerable detail given the fact-intensive inquiry required in this case.

On November 20, 1988, Plaintiff's oldest daughter died as a result of kidney failure. Four months earlier, Plaintiff (then 44 years old) had donated one of her own kidneys in an attempt to save her daughter's life. Devastated, Plaintiff began taking medication to help cope with her loss. Plaintiff began using Xanax, a drug that helps relieve stress and anxiety, on the prescription of her family physician. After Plaintiff overdosed on the drug in July, 1989, Plaintiff began to see a psychiatrist, Ronald A. Krisch, M.D. ("Dr. Krisch"). Dr. Krisch diagnosed Plaintiff as suffering from "depressive symptoms" and treated her for anxiety and depression. Psychiatric Summary, Pl.'s App. at 25–27. At some point during Plaintiff's therapy, Dr.

Krisch placed her on the anti-depressant drug Prozac. Satisfied with the effects of Prozac, Plaintiff discontinued her sessions with Dr. Krisch in February, 1990. Plaintiff has since been treated for anxiety and depression by her family physicians at Macungie Medical Group and by another psychiatrist. The most serious statement of her condition, however, appears in the report of Robert L. Sadoff, M.D., who performed an independent psychiatric examination pursuant to an order of this Court dated January 22, 1997. Dr. Sadoff writes at page 10 of his report that "Ms. Sarko is best diagnosed as having a prolonged grief reaction regarding the death of her daughter.... One might even diagnose her as having dysthymia, which is prolonged chronic depression related to the death of her daughter in 1988."

Plaintiff was hired by Defendant on June 10, 1991. She indicated on her application that she did not have a handicap and she readily admits that neither her depression nor the medication she took to combat it affected her performance at Penn–Del. In fact, Plaintiff quickly established herself as an outstanding salesperson. According to Meryl Fischer ("Fischer"), Plaintiff's immediate supervisor from early 1992 until June, 1993, Plaintiff was the number one salesperson in the office in 1992. She was the salesperson of the month several times and was awarded a certificate of high achievement for her 1992 sales performance by Division Sales Manager Victor Raad ("Raad"). Plaintiff's performance was so impressive at the start, in fact, that Raad's predecessor, Del Humenik, offered Plaintiff a promotion in early 1992 which Plaintiff refused because she would have been required to move. Although Plaintiff's 1993 sales record was not as strong, Fischer testified that even when Plaintiff's performance "slipped one or two notches ... she was always in the top performers." Fischer Dep. at 9–10. Plaintiff's condition also did not prevent her from putting in long hours. During the busy first six months of the year, Plaintiff worked to between 7:00 p.m. and 8:00 p.m. on average, even skipping lunches and breaks when necessary.

The combination of Xanax and Prozac did, however, make it more difficult for Plaintiff to get up in the morning, and Plaintiff blames this grogginess for her problems with chronic tardiness throughout her employment at Penn–Del. Under Penn–Del's "Rules for Telephone Salespeople," Plaintiff was required to report to work by 9:00 a.m. from the date she started until January, 1994. Plaintiff was late fourteen times in 1992 and seventeen times during the eight months she worked in 1993.[1] The exact number of times Plaintiff reported late to work in the first six months of 1994 is disputed, but Plaintiff concedes that her tardiness continued to be "excessive" as defined by Penn–Del, i.e. more than four times in one quarter or more than six times in a six month period. Typically, Plaintiff was late by no more than fifteen minutes, although on isolated occasions Plaintiff would come in more than one hour late.

Fischer documented each instance of lateness and spoke to Plaintiff on several occasions regarding the problem. Fischer warned her that continued excessive tardiness could lead to her termination. Fischer nonetheless felt sympathy for Plaintiff's situation as she had also experienced the death of a close family member, her husband, and she was aware of the effects that the medication had on Plaintiff in the morning.[2] As a result, Fischer thought Plaintiff deserved a break regarding her starting time, particularly because Plaintiff was rarely more than a few minutes late, worked long hours once there, and was a good salesperson. Fischer explained Plaintiff's situation to Raad and requested that Plaintiff be accommodated on her starting time, but Raad denied the request.

---

1. From August 9, 1993, until January 10, 1994, Plaintiff was out on disability to recover from back surgery. Plaintiff does not allege any unlawful discrimination stemming from this absence.

2. At no time during her employment at Penn–Del, however, did Plaintiff complete the "Bell Atlantic Voluntary Self Identification Form for Veterans and Individuals with Disabilities," nor did she make a written request for an accommodation.

This was not the only occasion in which Raad expressed his displeasure with Plaintiff's tardiness. In fact, Raad was "constantly calling [Fischer] on the carpet about [Plaintiff's] tardiness." Compl., Ex. A at 2. At one point, Raad came to Fischer and told her to "build a case against" Plaintiff because he wanted to "get rid of her" on account of her lateness. Fischer Dep. at 16–17. In addition, in March, 1993, Raad refused to accept Fischer's recommendation that Plaintiff be promoted to sales coach. Raad had a memo typed on Fischer's behalf which makes it appear that Fischer did not recommend Plaintiff for the promotion based on her tardiness. Fischer neither signed nor initialed the memo. Fischer also testified that Raad would tease Fischer about her age. "He used to call me old, tell me I was old, and he thought he was kidding around." *Id.* at 18. Raad, born in 1960, was twenty-two years younger than Fischer and seventeen years younger than Plaintiff.

In June, 1993, Raad transferred Plaintiff to the crew headed by Rebecca Brahm ("Brahm"), then 25 years of age. From that point forward, Brahm made life difficult for Plaintiff. For example, Brahm required Plaintiff to perform tasks that she required of no one else. Brahm also strictly enforced the 9:00 a.m. starting time. On July 21, 1993, after Plaintiff had been several minutes late for work at least five times that month, Brahm met with Plaintiff to discuss the problem. Plaintiff indicated that she was having personal troubles and was taking medication that caused her to be drowsy in the morning, but Plaintiff did not elaborate.[3] The next day Plaintiff signed a document acknowledging that she was to report on time for work, which she did until she began extended disability on August 9, 1993.

When Plaintiff returned to work on January 10, 1994, she received her evaluation for the six month period ending June 30, 1993. The evaluation—which was signed by Brahm and Ray DeLorenzo ("DeLorenzo"), who suc-ceeded Raad as Division Sales Manager in late 1993—reflected a significant drop-off in her sales performance from 1992. It also documented Plaintiff's problems with lateness and stated that "further tardiness would lead to dismissal." Def.'s Ex. J. at 5 (original in all caps). Also in January, 1994, Penn–Del began periodically offering members of Brahm's crew the option of starting at 8:00 a.m. Despite her problems waking up and arriving for work on time, Plaintiff requested the 8:00 a.m. starting time. From then on, to the extent that the 8:00 a.m. option was available (roughly half the time), Plaintiff continued to arrive for work several minutes late on a regular basis, just at the earlier time.

Plaintiff was not the only member of Brahm's crew whose personal life caused regular tardiness and absenteeism at work. Two younger male employees, Jim Oswald ("Oswald"), born in 1961, and Matt Stewart, born in 1967, also were either late or absent numerous times in 1993 and 1994 due to personal circumstances. According to Penn–Del's records, Oswald and Stewart were each late less often than Plaintiff, and neither was late on an excessive basis within the meaning of Penn–Del's rules. According to Plaintiff, however, both were late far more often than the records reflect, but were shown preferential treatment by Brahm, enabling them to arrive late to work without being noticed.[4] Plaintiff's arrival time, on the other hand, was monitored daily by Brahm or the receptionist on Brahm's behalf. In addition, Stephanie Vlattas ("Vlattas") was also a younger Penn–Del employee, born in 1961, who was often late or absent without excuse because of personal difficulties. Despite this fact, Vlattas was actually promoted to sales coach before she eventually resigned.

On June 29, 1994, after Plaintiff arrived for work five minutes late, Brahm called Plaintiff into her office and—on her own recommendation and with the approval of William Kai-

---

3. Plaintiff subsequently informed Brahm of the death of her daughter and her use of Prozac, but never made Brahm familiar with her personal difficulties to the extent that she did with Fischer. Further, Fischer and Brahm never spoke about Plaintiff's personal circumstances.

4. Brahm and Stewart later became romantically involved and married in November, 1996.

ser ("Kaiser"), who replaced DeLorenzo as Division Sales Manager in April, 1994—terminated Plaintiff. Plaintiff then requested to speak with Kaiser. Brahm had brought Plaintiff's tardiness to Kaiser's attention a "number of times," but had never informed him of Plaintiff's personal situation or use of medication. Kaiser Dep. at 10.[5] After hearing Plaintiff's explanation, Kaiser did not reverse the decision to terminate her and, instead, informed Plaintiff that "the reason for her termination was excessive tardiness, period." *Id.* at 9. Plaintiff was the oldest member of Brahm's crew when she was terminated. On July 5, 1994, Penn–Del hired Deborah Guth, then 40 years old, to replace her.

## DISCUSSION

### I. Standard for Summary Judgment Pursuant to Rule 56

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Our responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). The presence of "a mere scintilla of evidence" in the nonmovant's favor will not avoid summary judgment. *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989)(citing *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11). Rather, we will grant summary judgment unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the

initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

### II. The Method of Proof in Employment Discrimination Cases

The parties agree that Plaintiff's claims are governed by the burden shifting framework first set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and clarified in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Olson v. General Elec. Astrospace,* 101 F.3d 947 (3d Cir.1996)(ADA claim); *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996) (en banc)(Title VII claim); *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326 (3d Cir.1995)(ADEA claim). This framework has three steps: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) the plaintiff may then "demonstrate that the employer's stated reason was not its true reason, but merely a pretext for discrimination." *Id.* at 330.

In *Sheridan,* the Third Circuit, sitting en banc, clarified the quantum and nature of evidence required to submit pretext claims to a jury. The court reaffirmed its prior holdings that when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff may defeat summary judgment by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

**5.** Brahm had also never told Kaiser that Oswald and Stewart also had difficulty getting to work on time.

believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Sheridan,* 100 F.3d at 1067 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)); *see also Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 66 (3d Cir.1996); *Brewer,* 72 F.3d at 331. The district court's role is to "determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible." *Sheridan,* 100 F.3d at 1072. In doing so, we must not usurp the jury's "traditional function of assessing the weight of the evidence, the credibility of the witnesses through observation of both direct testimony and cross-examination at trial, and the strength of the inferences that can be drawn from the elements of the prima facie case and the evidence that undermines the employer's proffered reasons for its actions." *Id.*

### III. Count I: the ADEA Claim

In Count I, Plaintiff alleges that Penn–Del violated the ADEA by terminating her because of her age. To state a prima facie case under the ADEA, a plaintiff must establish that she (1) is over 40; (2) is qualified for the position in question; (3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person to permit an inference of age discrimination. *Brewer,* 72 F.3d at 330 (citing *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995)). Penn–Del moves for summary judgment on the grounds that Plaintiff has failed to establish the fourth element of the prima facie case. Alternatively, Penn–Del argues that Plaintiff has failed to present sufficient evidence to cast doubt on its claim that she was fired only for excessive tardiness.

■ Penn-Del contends that the fourth element is not satisfied because Plaintiff was not replaced by any one employee in particular. There is a factual issue in this regard,

however, because Brahm testified in her deposition that Plaintiff was replaced by Guth. *See* Brahm Dep. at 65. Penn–Del argues that Plaintiff's claim still fails because Guth was forty years old when Penn–Del hired her. The Third Circuit has clearly held that a plaintiff may present a prima facie ADEA case even if the beneficiary of the alleged discrimination was a member of the protected class. *Barber v. CSX Distribution Services,* 68 F.3d 694, 699 (3d Cir.1995). The plaintiff need only show that the beneficiary is " 'sufficiently younger' to permit an inference of age discrimination." *Id.* (quoting *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 792 (3d Cir.1985)). In *Barber,* for example, our Court of Appeals found the eight year difference between the plaintiff, age 52, and the beneficiary, age 44, sufficient to permit an inference of age discrimination. *See also Healy v. New York Life Ins. Co.,* 860 F.2d 1209 (3d Cir.1988)(nine year difference sufficient). Thus, we find the ten year difference between Plaintiff and Guth sufficient here.

■ The propriety of summary judgment on Plaintiff's ADEA claim therefore depends on whether Plaintiff has pointed to "some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Sheridan,* 100 F.3d at 1067 (quoting *Fuentes,* 32 F.3d at 764)(emphasis added). It appears in this case that Plaintiff has done both. First, Plaintiff has submitted evidence that, despite what Penn–Del's records say, two other members of Brahm's crew were late as often as Plaintiff yet were not terminated. Second, the reason Penn Del's records were selective is that Brahm and Raad discriminated against Plaintiff based on her age. Viewing the evidence in the light most favorable to Plaintiff, Raad, an individual who had joked about Fischer's age in the past, told Fischer to "build a case against" Plaintiff so that she could be fired.[6] Raad then trans-

---

6. Raad's age-related jokes to Fischer, though temporally remote from the decision to fire Plaintiff, may nonetheless be considered as cir-

cumstantial evidence of discrimination. *See Brewer,* 72 F.3d at 333; *Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1215 (3d Cir.1995).

ferred Plaintiff to the crew headed by Brahm, a supervisor in her mid-twenties. Brahm monitored Plaintiff's arrival time each morning while letting Oswald and Stewart arrive late on a regular basis. A third younger employee not supervised by Brahm also was frequently late, and she was promoted before she resigned. Such evidence would permit a reasonable factfinder to conclude "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Sheridan,* 100 F.3d at 1067 (quoting *Fuentes,* 32 F.3d at 764).

Penn-Del emphasizes that (1) none of Plaintiff's managers made age related comments to her and (2) there is no proof that Kaiser, the "final decision maker" was motivated by Plaintiff's age. As the Third Circuit noted in *Sheridan,* however, "[t]he distinct method of proof in employment discrimination cases ... arose out of the recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire." 100 F.3d at 1071. Defendant also points to the evidence that Penn–Del has discharged numerous employees of all ages for excessive tardiness and that Fischer, Plaintiff's supervisor for over a year, was older than Plaintiff. While such evidence may support Defendant's claim, it does not warrant an award of summary judgment in its favor.

### IV. *Count II: the Title VII Claim*

■ In Count II, Plaintiff alleges that Defendant violated Title VII by terminating her for chronic tardiness while not discharging two male employees who also arrived late on an excessive basis. The first step in the analysis is whether Plaintiff has made out a prima facie case of sex discrimination. In *Sheridan,* the court held that to establish a prima facie Title VII claim of discriminatory discharge a plaintiff must show (1) that she is a member of the protected class, (2) she was qualified for that position, (3) she was discharged, and (4) the position was ultimately filled by a person not of the protected class.

*Sheridan,* 100 F.3d at 1066 n. 5 (citing *Waldron v. SL Industries,* 56 F.3d 491, 494 (3d Cir.1995)). In this case, Plaintiff was replaced by Deborah Guth, thus the fourth element would not be present under this test.

Our Court of Appeals has held, however, that "the prima facie case is not rigid and should be adjusted to comport to the claims advanced and facts presented." *Moore v. Grove North America, Inc.,* 927 F.Supp. 824, 831 (M.D.Pa.1996)(citing *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990)). Because the essence of Plaintiff's claim here is that she was discharged by Brahm while Oswald and Stewart were not, it is more appropriate to require Plaintiff to demonstrate that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) other employees not in the protected class were treated more favorably. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir. 1993). Indeed, Defendant appears to concede that Plaintiff has made out a prima facie case—or that there are at least material issues of fact with respect to each element—as Penn–Del's arguments bear on the third step of the *McDonnell Douglas* analysis.

■ Defendant argues that Plaintiff has submitted insufficient direct or circumstantial evidence of gender discrimination because the supervisor who discharged Plaintiff was a woman; her prior supervisor was a woman; Penn–Del has discharged both men and women for excessive tardiness; Penn–Del hired a woman to replace her; Penn–Del employed twice as many women as men in the summer of 1994; and Penn–Del promoted Vlattas to the position of sales coach. Under *Sheridan,* however, the admittedly weak evidence of gender discrimination in this case does not prevent Plaintiff's Title VII claim from reaching the jury because Plaintiff has offered sufficient evidence that Defendant's proffered justification is pretextual.[7] To repeat, a plaintiff may defeat summary judgment by offering sufficient evidence "from which a factfinder could reasonably *either* (1) disbelieve the

---

**7.** We find Defendant's argument that Plaintiff has waived her right to a jury on her Title VII, ADA and PHRA claims to be without merit. The

demand in paragraph eight of her Complaint was specifically incorporated into all four counts.

employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Sheridan,* 100 F.3d at 1067 (quoting *Fuentes,* 32 F.3d at 764) (emphasis added). As we concluded in our discussion of Plaintiff's ADEA claim, Plaintiff has offered sufficient evidence to cast doubt on Defendant's claim that Plaintiff was discharged for excessive tardiness. The clear holding of *Sheridan* is that a jury is permitted, though not compelled, to find a Title VII violation based only on the plaintiff's prima facie case and disbelief of the defendant's proffered justification. 100 F.3d at 1066–69. There need not also be additional evidence that "gender was the motive of those in the decision-making process." *Id.* at 1071; *see also id.* at 1086–87 (Alioto, J., concurring in part and dissenting in part); *Moore,* 927 F.Supp. at 832 (denying summary judgment on Title VII claim despite finding "nothing in the record" to support finding of gender based discharge). Accordingly, Defendant's Motion is also denied with respect to Count II.

## V. *Count III: the ADA Claim*

In Count III, Plaintiff claims that her discharge violated the ADA. To establish a prima facie claim of unlawful discrimination in violation of the ADA, a plaintiff must demonstrate that (1) she has a disability within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the job; and (3) she has suffered an adverse employment decision as a result of discrimination. *Horth v. General Dynamics Land Systems, Inc.,* 960 F.Supp. 873, 877 (M.D.Pa.1997); *see also Olson,* 101 F.3d at 951. Defendant moves for summary judgment on the grounds that Plaintiff does not have a "disability" within the meaning of the ADA. Under the ADA, a person has a "disability" if she "(1) has 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual'; (2) has 'a record of such an impairment'; or (3) is 'regarded as having such an

impairment.'" *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996)(quoting 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)). Plaintiff alleges that she falls within the first and third categories. We address each claim in turn.

### A. *Does Plaintiff have a substantially limiting impairment?*

■ Under the regulations, a person "is substantially limited in a major life activity if he is '[u]nable to perform a major life activity that the average person in the general population can perform' or is '[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)). As we have noted before, in deciding whether an impairment is a disability, courts take a pragmatic, fact-intensive look at each plaintiff and determine:

> (1) the nature and severity of the impairment,
>
> (2) the duration or expected duration of the impairment, and
>
> (3) either the actual or the expected permanent or long term impact of or resulting from the impairment.

*Penchishen v. Stroh Brewery Co.,* 932 F.Supp. 671, 674 (E.D.Pa.1996)(citing 29 C.F.R. § 1630.2(j)(2)), *aff'd,* 116 F.3d 469 (3d Cir.1997)(Table, No. 96–1807). Our Court of Appeals has stressed, however, that "'[t]o rise to the level of a disability, an impairment must significantly restrict an individual's major life activities. Impairments that result in only mild limitations are not disabilities.'" *Kelly,* 94 F.3d at 107 (quoting 2 *EEOC Compliance Manual* § 902, at 902–19).

■ In this case, Plaintiff claims that her depression was a mental impairment that substantially limited the major life activity of working. *See* 29 C.F.R. § 1630.2(i).[8] Courts

---

8. Plaintiff also claims that "the mental impairment substantially limited a major life activity; namely, the ability to get a sound night's sleep and to report to work on time, clear-minded, in

the morning." Pl.'s Mem. at 23. Plaintiff cites no cases recognizing such a major life activity, and we find no support for doing so here. *See Soileau v. Guilford of Maine, Inc.,* 928 F.Supp.

have consistently held that depression constitutes a mental impairment under the ADA. *See Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. 37 (D.Me.1996), *aff'd,* 105 F.3d 12 (1st Cir.1997); *see generally,* EEOC Enforcement Guidance: The Americans with Disabilities Act and Psychiatric Disabilities, 2 *EEOC Compliance Manual,* filed after § 902 (March 25, 1997). In order to establish that depression substantially limits her ability to work, however, Plaintiff "must demonstrate that she is unable to perform 'either a class of jobs or a broad range of jobs in various classes as compared to the average person.'" *Horth,* 960 F.Supp. at 878 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Plaintiff simply fails to offer any evidence that her depression, or the medication she took to combat it, rendered her unable to perform any such class or broad range of jobs. Plaintiff admits that she was able to work long hours and perform quite successfully as a salesperson while at Penn–Del. *See* Sarko Dep. at 109–110, 121. Despite the grogginess caused by the combination of Xanax and Prozac, Plaintiff felt sufficiently confident in her ability to wake up each morning to request an 8:00 a.m. starting time in January, 1994. Plaintiff has submitted no evidence of any jobs her condition rendered her unable to perform. Finally, Plaintiff makes no effort to distinguish two recent and factually similar cases to which Defendant has directed us. *See Soileau,* 928 F.Supp. at 49–50 (holding that plaintiff with psychological disorder, whose disorder only hampered one job requirement, who acknowledged that he was capable of working despite his condition, and who provided no evidence of jobs he would be unable to perform, was not disabled under ADA); *Kotlowski v. Eastman Kodak Co.,* 922 F.Supp. 790 (W.D.N.Y.1996)(holding that plaintiff with history of chronic tardiness who attributed problem to her depression and medication used to relieve it was not disabled under ADA). We therefore find that Plaintiff's depression in this case did not constitute a substantially limiting impairment under the ADA.

37, 47–48 (D.Me.1996)(rejecting claim that "inability to interact with others" implicated major

**B. Was Plaintiff regarded as having such an impairment?**

As noted above, a plaintiff may be considered disabled under the ADA if her impairment does not substantially limit a major life activity, if her impairment "'is treated by a covered entity as constituting such limitation.'" *Kelly,* 94 F.3d at 108 (quoting 29 C.F.R. § 1630.2(*l*)(1)). Such a claim does not focus on the plaintiff's actual abilities, "but rather on the reactions and perceptions of the persons interacting or working with [her]." *Id.* at 108–9 (quoting 2 *EEOC Compliance Manual,* § 902, at 902–3 to 902–4). The Third Circuit has instructed that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action." *Id.* at 109. Instead, the plaintiff must demonstrate that her employer "perceived that not only did she suffer from a mental impairment, but that such [perceived] impairment substantially limited her ability to work." *Johnson v. Boardman Petroleum, Inc.,* 923 F.Supp. 1563, 1568 (S.D.Ga.1996).

We find no evidence that Defendant regarded Plaintiff as having a substantially limiting disability and, in fact, there is significant evidence to the contrary. Plaintiff indicated on her application for the position at Penn–Del that she did not have a handicap. Plaintiff never completed the "Bell Atlantic Voluntary Self Identification Form for Veterans and Individuals with Disabilities," nor did she make a written request for an accommodation. Defendant trusted Plaintiff with the full range of duties performed by all of its sales representatives and actually offered her a promotion in 1992. Plaintiff even volunteered in her deposition that she was able to work effectively "as the company saw it." Sarko Dep. at 103. *See id.* at 1568 (rejecting claim that plaintiff was regarded as disabled where plaintiff "presented no direct evidence from which [her employer] could have perceived that she had a limiting disability").

Plaintiff emphasizes Fischer's testimony that (1) she was aware of Plaintiff's depres-

life activity under ADA), *aff'd,* 105 F.3d 12 (1st Cir.1997).

sion and the effects of the medication she used to combat it, (2) she informed Raad of these facts, and (3) she tried to convince Raad to accommodate Plaintiff on her starting time accordingly. There is also evidence that Brahm was aware (to a lesser extent than Fischer) of Plaintiff's condition and use of medication. Such evidence does not, however, indicate that Fischer, Raad or Brahm perceived Plaintiff as having a substantially limiting impairment within the meaning of the ADA. Again, *Johnson* is instructive, as the court found the employer's knowledge that the plaintiff was "under stress or suffered from grief [caused by the death of her husband] does not rise to the level of demonstrating that [the employer] thought she had a mental disability or that she was unable to work because of this disability." *Id.; see also Penchishen,* 932 F.Supp. at 674–75. In this case, moreover, any perception of limitation on the part of Penn–Del's management would no longer have existed once Plaintiff requested the 8:00 a.m. starting time in January, 1994. Indeed, this request indicates that Plaintiff did not perceive herself limited in her ability to make it to work in the morning.

Finding no triable issues of fact as to whether Plaintiff has a disability under the ADA, we conclude that Plaintiff has failed to establish a prima facie ADA case. Summary judgment is therefore awarded to Defendant on Count III.

### VI. Count IV: the PHRA Claim

As the Third Circuit has explained, "[w]hile the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts." *Kelly,* 94 F.3d at 105 ("holding that district court properly treated

PHRA claims as coextensive with his ADA and ADEA claims")(internal citations omitted); *see also Davis v. Sheraton Society Hill Hotel,* 907 F.Supp. 896, 899 n. 1 (E.D.Pa. 1995)("The PHRA is applied to accord with Title VII."). Thus, consistent with our rulings on Plaintiff's federal claims, we award Defendant summary judgment on the PHRA claim only to the extent that she alleges discrimination based on disability.

### VII. Mitigation of Damages

■■■ Defendant argues that it is entitled to summary judgment because Plaintiff failed to mitigate her damages. A claimant has a statutory duty under both Title VII and the ADEA to mitigate her damages, but the burden of proving the failure to mitigate is on the employer. *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 864 (3d Cir.1995)(Title VII); *Finch v. Hercules Inc.,* 941 F.Supp. 1395, 1421 (D.Del.1996)(ADEA). In order to meet this burden, the employer must demonstrate that (1) substantially equivalent work was available and (2) the plaintiff did not exercise reasonable diligence to obtain the employment. *Booker,* 64 F.3d at 864; *Finch,* 941 F.Supp. at 1421. This determination is generally one for the factfinder. *Id.*

Apart from a two-week stint at a travel agency in 1995, Plaintiff has not been employed since being discharged by Penn–Del. Further, her efforts to find work have consisted of looking in the newspaper, but not contacting any employment agencies, and she has applied for just three positions other than the one she briefly held at the travel agency. We nonetheless find summary judgment inappropriate on this issue for two reasons. First, Plaintiff's ability to find work after her discharge was restricted by a broadly worded provision of the "Employment and Confidentiality Agreement" she entered into on June 10, 1991.[9] This provision

---

**9.** Under paragraph eight of the Agreement, Plaintiff agreed:

*for a period of two years* after the termination of employment, in those areas of the States of New Jersey, Delaware and Pennsylvania in which the Company, or in which the said National Telephone Directory Corporation, at the time of such termination, conducts sales of advertising, or has announced its attention to

conduct such sales, *not to be involved in any capacity* including as principal, agent, employee, employer, stockholder, advisor, partner or consultant, or in any capacity whatsoever, *in any business or entity which:*
   A. *Solicits the sales of advertising;* or
   B. Is in any way related to the placement of advertising in the directories of the New Jersey Bell Telephone Company, the Dia-

creates a jury question as to whether Plaintiff's efforts were reasonable under the circumstances. Second, the burden of proving Plaintiff's failure to mitigate rests with Penn–Del. While Penn–Del asserts in its brief that numerous substantially equivalent positions were available, it has offered no evidence on this point. *See Booker,* 64 F.3d at 866 (" 'Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.' ")(quoting *Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir.1990)). Penn–Del has therefore failed to meet its burden under Rule 56.

*VIII. Punitive Damages*

■■■ We join the members of this Court who have predicted that, despite the Superior Court's opinion in *Hoy v. Angelone,* 456 Pa.Super. 596, 691 A.2d 476 (1997)(vacating award of punitive damages under PHRA), the Supreme Court of Pennsylvania will adopt the reasoning of "the persuasive line of federal cases which have permitted punitive damages under the PHRA." *Kim v. City of Philadelphia,* 1997 WL 277357 (E.D.Pa. May 21, 1997)(Dubois, J.); *see also Gould v. Lawyers Title Insurance Corporation,* 1997 WL 241146 (E.D.Pa. May, 7 1997)(Buckwalter, J.); *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 486 (3d Cir.1997)(refusing to decide availability of punitive damages under PHRA). Thus, Plaintiff may recover punitive damages under the PHRA for her claims of both age and gender discrimination. Defendant requests summary judgment on the issue of punitive damages on the grounds that the evidence is insufficient to support such an award under either theory. Having found sufficient evidence to submit these claims to a jury, we will not dismiss the requests for punitive damages at this point. Defendant may of course renew its request during and after trial in the form of motions under Fed.R.Civ.P. 50.

mond State Telephone Company, the Bell Telephone Company of Pennsylvania, or any directories; or
C. Serves as an advertising consultant; or

## CONCLUSION

Summary judgment is therefore denied as to Counts I and II, granted on Count III, and granted on Count IV only to the extent that Plaintiff claims unlawful discrimination based on disability. An appropriate Order follows.

## ORDER

AND NOW, this 9th day of July, 1997, upon consideration of the Motion of Defendant Penn–Del Directory Company for Summary Judgment on all counts of the Complaint of Plaintiff Sharon K. Sarko, Plaintiff's opposition to the Motion, and the replies and sur-replies thereto, it is hereby ORDERED in accordance with the attached Memorandum that the Motion is GRANTED in PART and DENIED in PART as follows:

(1) the Motion is GRANTED on Count III in its entirety and Count IV only to the extent that Plaintiff alleges unlawful discrimination based on disability;

(2) the Motion is DENIED in all other respects.

D. Is otherwise in competition with the said National Telephone Directory Company.
Agreement, ¶ 8 (emphasis added).