

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-2003

# Szczesny v. GE Co

Precedential or Non-Precedential: Non-Precedential

Docket 02-1331

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Szczesny v. GE Co" (2003). *2003 Decisions.* Paper 550.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/550

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO.  02-1331

_____

DANIEL J. SZCZESNY,
Appellant
v.

GENERAL ELECTRIC COMPANY

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil No. 99-256
(District Judge: Honorable Sean J. McLaughlin)

_____

Argued February 24, 2003
Before: BECKER, Chief Judge,[*] SCIRICA, Circuit Judge,[**] and SHADUR,[***]District
Judge

(Filed:      May 19, 2003                )

JOHN R. ORIE, JR., ESQUIRE
MARJORIE E. CRIST, ESQUIRE (Argued)
ORIE & ZIVIC
25th Floor Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219

_____

[*]Judge Becker completed his term as Chief Judge on May 4, 2003.

[**]Judge Scirica began his term as Chief Judge on May 4, 2003.

[***]The Honorable Milton I. Shadur, United States District Judge for the Northern
District of Illinois, sitting by designation.

Attorneys for Appellant

ROGER H. TAFT, ESQUIRE (Argued)
MATTHEW W. McCULLOUGH
MacDonald, Illig, Jones & Britton LLP
100 State street, Suite 700
Erie, PA 16507-1498

Attorneys for the Appellee

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge*.

This is an appeal by Daniel Szczesny from the District Court's grant of summary judgment in favor of defendant General Electric Company ("GE"). Szczesny claims that his termination from employment by GE violated the Age Discrimination in Employment Act, the Pennsylvania Human Relations Act, the Americans with Disabilities Act, and ERISA. We agree with the District Court that there is no genuine issue of material fact, hence we affirm.

**I.**

GE employed Szczesny for twenty years, during most of which time he was a model employee. He started working as a factory worker and steadily rose through the ranks of the company earning positive evaluations, commendations and certificates of achievement. In 1995, two years before his termination, he accepted a position in the Customer Training Department, where he reported to James Terrill, the Manager of

Customer Training. Terrill planned to retire in July 1996, and Szczesny was slated to replace him at that time. When Szczesny did replace Terrill, his duties included providing CD-ROM training programs to railroad customers under existing contracts, interfacing with third party contractors who were developing CD-ROM training materials for GE, and marketing training programs to new and existing customers. Szczesny reported directly to John Park, who had selected him for the position.

According to evidence adduced by GE, soon after Szczesny took over as Manager of Customer Training, "management of the Customer Training Department deteriorated and became virtually nonexistent by the end of the year." He missed work with increasing frequency, sometimes for several days at a time, without advising others where he was and without appointing a designee to act in his place in accordance with GE policy. (A121-22, 156, 173-76, 180-81.) He also failed to establish schedules and to hold production meetings regarding the CD-ROM interactive training devices and other training materials that were promised to the railroad customers, and according to GE, he failed to require outside suppliers to comply with delivery deadlines regarding the CD-ROM training programs. (A157-58, 190-91.) Other training instructors were forced to field inquiries and telephone calls because his telephone mailbox was often full, (A157-59, 174-79), and he failed to respond to email messages or notes left on his chair. (A159, 174-78, 413, 419-20.)

These failures caused the training instructors, as a group, to request a meeting with

Park about Szczesny and the department. (A121-26.) They informed Park about Szczesny's absences, the trainers' inability to reach him for responses to their questions, and the difficulties of dealing with customers and contractors without an effective manager. (A137-38.) On January 13, 1997, approximately six months after Szczesny became a Learning Center manager, Park met with him regarding his job performance problems. (A349-51.) During this meeting, he discussed Szczesny's absenteeism and his coworkers' inability to contact him. He also addressed customer complaints, Szczesny's failure to provide information and schedules that Park had requested prior to Christmas, and the fact that the Customer Training Department class brochure, which normally came out in November or December, remained incomplete. (A350-51.) Szczesny replied that he was having some personal problems related to stress on the job and to his son, who was allegedly depressed and considering dropping out of college. (A341-43, 346-47.) He also told Park that he was having some work-related problems with Marlene Korn, who was Manager of the Learning Center.

Following his meeting with Park, Szczesny told him that he wanted a less stressful position and requested that Park replace him as Manager of Customer Training. (A348, 357-58.) Park informed Szczesny that he had found for him a position in the Engineering Budget Group, where he would work on engineering budgets and forecasts under Jeff Woford. With Szczesny's consent, Park reassigned him to the position of Cost Analyst without requiring him to complete the normal interview process.

4

In March 1997, Park prepared an Annual Accomplishment Summary and Development Review regarding Szczesny's job performance during the prior year as part of the annual GE performance review. He met with Szczesny in April to discuss that appraisal. Park gave Szczesny an overall rating of "Below" and told Szczesny that he was unhappy with his performance as Manager of Customer Training. Park also noted that Szczesny had moved to an "individual contributor role" that was better suited to his basic skills and that Szczesny had to "reestablish credibility as a valuable team member in the Engineering Administration organization." (A429.) Szczesny admitted that he understood Park's concern about his job performance as Manager of Customer Training and did not dispute the appraisal. (A370.) Park also told Szczesny that he was being placed on monitored performance status as a result of his "Below" rating, (A371), and provided Szczesny with a letter memorializing that designation. The letter advised Szczesny that he was expected to show immediate and sustained improvement in each of several areas or be subject to termination from employment. (A372, 430.)

During this time Szczesny began counseling sessions with Fred McKinney, Ph.D., and attended a total of four such sessions between March and May 1997. (A1109-1110.) During the initial session, Szczesny told McKinney: that he had taken a new position eight months before as Manager of Customer Training; that this position had placed "lots of pressure" upon him "not to screw up"; that he "started to put things off"; that he "didn't succeed as well in the past"; and that he had requested a job transfer one month

earlier. (A1111-12.) Szczesny also told McKinney that he had had a conflict with Korn, his Manager at the Learning Center. Upon the completion of his fourth counseling session in May, McKinney stated that Szczesny was "doing well" and terminated the counseling sessions. Between that session and his termination in September 1997, Szczesny did not seek or receive any other counseling services. (A1116-17.)

In February 1997, Szczesny began his new position as Cost Analyst in the Engineering Administration Group. He was added to a group that already possessed one full-time Cost Analyst, Melanie Conover, who was performing the same duties as Szczesny and who had been working in that position for at least six months before Szczesny arrived. (A270, 289-90, 365-66.) Unlike Szczesny, Conover was a contract worker rather than a GE employee. (A289.) Both Szczesny and Conover reported to Woford, who in turn reported to Park. In this position Szczesny was responsible for entering data regarding actual project expenses and inputting revisions to the department's annual budget. In late April, Woford went to another company and Conover was transferred to a different manager, meaning that Szczesny dealt directly with various department sections in preparing the department budget. During the time that Szczesny held this job, Park had two or three further discussions with Sheflin, Szczesny's new boss, about Szczesny's still-unsatisfactory performance. (A245-51.) Park also had closed door sessions with Szczesny himself, (A273), who admitted that Park complained to him that he was excessively absent and unreachable. (A344, 395.)

Finally, in September 1997, Park went to Szczesny's office because he needed a report for Sheflin. Szczesny was not in his office, and Park and Szczesny's secretary were unable to reach him by phone. (A247-48.) Park left a note attached to Szczesny's computer screen requesting him to call Park, at home if necessary. (A247-48.) Szczesny never called Park, and when Park arrived at work the next day, he went to Szczesny's office and found the note where he had left it. (A248, 276-78.) He confronted Szczesny as to where he'd been the prior afternoon, and Szczesny claimed that he had gone home because his computer was down but that he had returned to the office that evening to do some work. (A247-48, 276-78.) Because the note had not been touched, however, Park concluded that Szczesny had not actually returned to work.

Two days later, Park met with Szczesny and told him that his employment was being terminated. (A396-98.) Park provided him with a written notice of termination which identified specific examples of his allegedly substandard work performance. (A396-98, 433-34.) Szczesny was fully vested in the GE Pension Plan at the time of his termination. (A301-02; 455-56.) In his EEOC Discharge Intake Questionnaire, Szczesny admitted that Park told him that the reason for his discharge was "poor performance," and further admitted the accuracy of several of the specific performance problems identified by Park in his termination notice. (A400-02, 436.)

Needless to say, Szczesny's account of what happened is very different. Szczesny argues that he was terminated as part of GE's "totem poling" scheme in which

older workers were systematically replaced with younger workers. In his estimation, being placed on "monitored performance status" was equivalent to an employment death sentence. (Blue Br. 10-11) (A544-63). As Szczesny explains:

> [T]he record contains material evidence of the following: (1) a pattern and practice of totem poling older workers and using the monitored performance framework to support said effort; (2) the use of totem poling and monitored performance on Appellant; (3) Appellee's representation to EEO authorities of terminated older workers, including Appellant as having "resigned"; (4) a record that supports Appellant as being a successful employee up to a year or so within his termination; (5) accusations immediately preceding his termination of subjective performance problems after a successful eighteen year work history; (6) contradictory action of recognizing Appellant needed a less stressful position, yet placing him on monitored performance of his old Learning Center position after he was moved to the Cost Analyst position; (7) stripping a merit pay increase from Appellant; (8) failures to follow the monitored performance guidelines and failure to meet with Appellant during this program for three prescheduled meetings to determine his progress; (9) transferring Appellant to a more stressful position, not training him and requiring him to absorb the job duties of co-workers; and, (10) taking the extreme disciplinary action against a 20 year veteran worker of termination on the basis of a missed phone call relative to a questionable note the circumstances of which are founded wholly upon hearsay.

(Blue Brief at 21-22.) He concludes that "the record in the case on appeal is replete with material factual disputes which are highly relevant to the resolution of whether Appellee's articulated reasoning were [*sic*] legitimate or pretextual." (*Id.*)

GE responds that most of Szczesny's accusations, even if true, are not evidence of

pretext. For example, most of Szczesny's performance awards were given in the 1980s, the most recent being in 1987. (A508-09.) Even the more recent positive evaluations, like those in 1995 and 1996, were from earlier assignments where he worked in lower-level, non-managerial positions. (A429.) GE points out that when Park gave Szczesny his 1997 Performance Appraisal, he did not dispute the negative feedback. (A370.) He also admitted that he had been informed that GE customers were complaining about delays in receiving CD-ROM materials, and that he did not take any steps to rectify the delays. (A332-40.) Finally, in his EEOC Discharge Intake Questionnaire, Szczesny admitted the accuracy of the specific performance problems identified by Park in his 1997 termination notice. (A400-02, 436.)

## III. Analysis

## A. Did Szczesny's Termination Violate the ADEA or PHRA?

We employ a four-part test for establishing a prima facie case of age discrimination under the ADEA and PHRA: the terminated employee (1) must be 40 years old or older; (2) must have been discharged; (3) must have been qualified for the job; and (4) must have been replaced by a significantly younger person to create an inference of age discrimination. *Showalter v. Univ. of Pitt. Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999). If these four elements are shown, the burden of production shifts to the defendant to demonstrate a legitimate non-discriminatory business reason for terminating the employee, at which point the burden of production shifts back to the employee to

submit evidence from which a reasonable factfinder could either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Suffice it to say that Szczesny has not submitted evidence from which a reasonable factfinder could either : (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Most importantly, the evidence supporting what might be his strongest claim – totem poling – is purely conclusory; it simply lacks evidentiary foundation. We have examined the record, and also find that his other eight allegations are either not supported by the record or are insufficient to meet his burden. It is sad when a long-time employee is discharged, but his longevity in the company does not immunize him from justified adverse employment action, which is the case here

**B. Did Szczesny's Termination Violate the ADA?**

To make out a claim under the ADA, Szczesny has the burden of showing: (1) that he was a member of a protected class or disabled within the meaning of the ADA; (2) that he was qualified for the position; (3) that he was dismissed despite being qualified; and (4) that he was ultimately replaced by a non-disabled person. *Walton*, 168 F.3d 661, 668 (3d Cir. 1999).

According to Szczesny, the record demonstrates that he suffered from high blood

10

pressure, hypertension, depression, extreme stress and anxiety, and alcoholism. (Blue Brief at 24.) Hypertension and cardiovascular conditions are recognized disabilities under EEOC regulations, *see* 29 C.F.R. § 1630.2(h), as is depression. *See Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1035 (E.D.Pa. 1997). Although alcoholism is not a per se disability under our extant jurisprudence, courts have found it a disability if it rises to the level of substantially limiting a major life activity. *Hinnershitz v. Ortep of Pa., Inc.*, 1998 U.S. Dist. LEXIS 20264 (E.D. Pa. 1998). Szczesny argues that GE "not only failed to place Appellant in a less stressful position upon his request, it did the opposite by purposefully transferring him to a high stress position requiring odd hours and 60 to 80 hours of work each week. Moreover, it made the position more stressful by failing to train Appellant and taking away co-workers and making Appellant absorb the removed co-worker's job duties." (Blue Brief at 26-27.) Szczesny concludes that there are material facts that should have been left for the jury to deliberate regarding the contention that Szczesny was disabled at the time of his termination, and therefore that summary judgment was improper.

GE vigorously disputes the notion that it set Szczesny up to fail or withdrew manpower support. When Szczesny expressed to Park concern about his ability to perform his Cost Analyst job without help, Park responded that Conover was available to help him, and that Szczesny also could call upon the two contract workers from the Productivity Measurements Group. (A390-91.) From July 1997 until Szczesny's

11

termination, Conover answered all of his questions, but he never asked her for help doing the work itself, nor did he request any assistance from the contract workers in the Productivity Measurements Group. He also never returned to Park to ask for more help. (A392-94.)

More fundamentally, however, GE alleges that it knew of no disability at the time it terminated Szczesny. In general, according to *Jones v. United Parcel Service*, 234 F.3d 402, 406 (3d Cir. 2000), "[i]t is . . . an axiom of any ADA claim that the plaintff be disabiled and that the employer be aware of the disability." *See also Rinehimer v. Cemcolift, Inc.* 292 F.3d 375, 380 (3d Cir. 2002) ("[T]o establish discrimination because of a disability, an employer must know of the disability."). The record is devoid of any evidence that Szczesny suffered from alcoholism; indeed, Szczesny denied that his job performance issues were caused by alcohol consumption and further denied that he had any problem with excessive drinking. (A698-700, 787-78.) Regarding the depression, McKinney (his therapist) found that he was doing well and terminated his visits after only four sessions. (A375-76, 381-82.) Szczesny admitted that he did not seek further sessions from McKinney or anyone else. In short, we are satisfied that the record is clear and unequivocal that Szczesny was not discharged because of a disability.

## C. Did Szczesny's Discharge Violate ERISA?

Szczesny argues that GE terminated him with the purpose of interfering with his right to benefits, an action prohibited by Section 510 of ERISA, 29 U.S.C. § 1140.

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993). As we stated in *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522-23 (3d Cir. 1997), "to recover under section 510, the employee must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." Mere proof of an "incidental loss" of benefits resulting from an employee's discharge from employment does *not* constitute a violation of Section 510. *Dewitt*, 106 F.3d at 522.

It is uncontested that Szczesny's pension rights had vested at the time of his dismissal; as such, his termination did not deprive him of his pension, but rather of only the ability to contribute additional money to it. That, GE states, is precisely the type of incidental loss to which Section 510 does not speak. We agree. Moreover, GE submits that there is nothing in the record indicating GE's specific intent to harvest Szczesny's pension funds. Szczesny's only evidence is the alleged totem polling scheme, which, as we have noted, is ephemeral.

For the foregoing reasons, the judgment of the District Court will be affirmed.

TO THE CLERK:

Please file the foregoing opinion.

_____
Circuit Judge